IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

THE CINCINNATI INSURANCE      *
COMPANY,      *
     *
      Plaintiff,      *
     *
vs.      *   Case No.  1:99-cv-00552-WS-C
     *
MATTHEW LEATH COCHRAN, et. al,      *
     *
      Defendants.      *
     *

# MOTION IN LIMINE REGARDING DEFENDANTS' EXPERTS

Plaintiff Cincinnati Insurance Company, Inc., moves this Court in Limine regarding the admissibility of testimony from individuals listed below that Plaintiff believes Defendants will tender as experts for various purposes in the above-referenced case.  This motion is made pursuant to *Federal Rule of Evidence* 702 and the case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny.  Plaintiff sets out first the general law as it applies to these experts and then discusses in more specific details the basis for exclusion of each particular expert's testimony.

**A.**      **General Applicable Principles of Law**

In *Daubert and Kumho Tire Company v. Carmichael*, 119 S. Ct. 1167 (1999), the Court found that Rule 702 of the *Federal Rules of Evidence* sets out the standard for admissibility of expert testimony and assigns the trial Judge as gatekeeper for screening of expert evidence before a jury hears it.  The test expressed by the Court in *Kumho and Daubert* for admissibility has two prongs- relevance and reliability. Relevance looks to whether the evidence can assist the trier of fact in the

context of the issues and the evidence in the case.  Reliability is concerned not with the ultimate correctness of the proffered testimony but rather whether the expert in reaching the opinion or conclusion to be expressed used sound scientific methodology.

Other Courts have required a third prong of qualification of the expert.  *In re*: *Polypropylene Carpet Antitrust Litigation*, 93 F. Supp.2d 1348, 1352 (N.D. Ga. 2000); *Bushore v. Dow-Corning Wright Corp*., 1999 U.S. Dist. LEXIS 20697 (M.D. Fla. 1999); *Wheat v. Sofamor*, SNC, 46 F. Supp.2d 1351 (N.D. Ga. 1999).

Following *Daubert,* Rule 702 was amended to state explicitly that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue [relevance], a witness qualified as an expert by knowledge, skill, experience, training or education [qualified expert], may testify thereto in the form of opinion if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness applies the principles and methods reliably to facts of the case. [reliability].  See Fed. R. Evid. 702.

In *Kumho Tire Company v. Carmichael*, 119 S. Ct. 1167 (1999), the Court unequivocally held that Federal Trial Courts' "General Gate Keeping Obligation" under Federal Rule of Evidence 702 "applies not only to [expert] testimony based upon 'scientific' knowledge, but also to testimony based on 'technical' and other 'specialized' knowledge." *Id*. at 1171.  (*Kumho* dealt with knowledge acquired through personal experience-non scientific).  Rule 702, the Court explained "establishes a standard of evidentiary reliability" that "applies to all expert testimony."  *Id*. at 1174, 1175. (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc*. 509 U.S. 579, 590 (1993).

> [The Rule] requires a valid . . . . connection to the pertinent inquiry as a precondition to admissibility. * * * And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question * * * , the trial Judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline."

Id at 1175 (quoting *Daubert*, 509 U.S. at 592).

### Qualifications

An expert must be qualified to offer testimony. *Malbrough v. State Farm Fire and Casualty Company*, 1996 WL 565819 (E.D. La. 1996); *Baker v. Smith and Nephews Richards, Inc*. 199 U.S. Dist. LEXIS 19760 (N.D. Ga. 1999).

Personal observation and experience may lead to qualification as an expert but not simply generalize claims of opinions premised upon personal experience, i.e. *ipse dixit* based declarations. The Court looks at whether the expert has real world experience in the area proffered as an expert. *Paoli Railroad Yard, PCB Litigation*, 35 F.3d 717, 742 (3rd Cir. 1994). Experts cannot simply be someone who acquired supposed expertise by accumulating information and testifying. *Thomas J. Kiln*, *Inc. v. Lorillard, Inc*., 878 F.2d 791 (3rd Cir. 1989).

### Relevance

The Court explained in *Daubert* that expert testimony is admissible only if it helps the trier of fact understand the evidence and the issues in the case. The Court stated:

> Rule 702 further requires that evidence or testimony "assist the trier of fact to understand the evidence to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 3 Weinstein and Berger, Para. 702 [02], p. 702-18. See also *United States v. Downing*, 753 F.2d 1224, 1242 (C.A.3 1985) ("An additional consideration under Rule 702-and another aspect of relevancy- is whether expert testimony proffered in the case is

-3-

> sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute").  The consideration has been aptly described by Judge Becker as one of "fit" *Ibid*.  "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes [citation omitted].  The study of the phases of the moon, for example, may provide valid scientific 'knowledge' about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact.  However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.  Rule 702's "helpfulness" standard requires a valid scientific connection to pertinent inquiry as a precondition to admissiablity.

*Id*. at 591.

The proper testimony must have a connection to the issues in dispute such that it materially advances in understanding of determination of factual disputes.  *Allison v. McGhan Medical Corporation*, 184 F.3d 1300, 1312 (11th Circuit 1999).  The soundness or reliability of the scientific testimony is a separate inquiry one not to be confused whether in the context of the factual issues of the case the proper testimony is such it might help.  For instance, the *Pythagorman Theorem* is valid in all context but it would not help in understanding the medical causation issue in a case.

## Reliability

Reliability standards are not to answer whether the expert's testimony may be helpful to the trier of  fact in the context of an issue that is actually in dispute but whether it is sufficiently worthy of belief that it should be even considered by the trier of fact.

The essence of scientific reliability which is the subject of *Daubert's* discussion, is whether proposed testimony is grounded in scientific method.  Proposed testimony must be supported by appropriate validation, i.e. good grounds on what is known.  *Id*. at 590.  It is the process of the

formation of the proposed testimony, and not whether the trial judge believes it true, that is the measure of admissibility.

The *Kumho* Court further held that "[t]he trial court must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id*. at 1176.  That means the trial court may invoke some of the criteria of reliability identified by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).  These criteria include whether the expert's theory or technique (1) can be (and has been) tested; (2) has been subjected to peer review and publication; (3) has a high known or potential rate of error; (4) is subject to standards controlling the technique's operation; and (5) enjoys "general acceptance" within a relevant scientific community. *Id* at 592-594.  The Court may also replace or supplement some of those criteria with other factors.  *Kumho*, 119 S. Ct. at 1175-1176.  The Court emphasized however, the importance of *Daubert's* gatekeeping requirement.  The objective of that requirement is to ensure the reliability and relevance of expert testimony.  It is to make certain, whether basing testimony upon professional studies or personal experience, experts employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.  *Id*. at 1176.  To ensure that this point is not lost on litigants in lower courts, Justice Scalia, joined by Justices O'Connor and Thomas, added in a concurrence:

> "I join the opinion of the Court, which makes clear that the discretion it endorses - trial - Court discretion in choosing the manner of testing expert reliability - is not discretion to abandon the gatekeeping function.  I think it is worth adding that it is not discretion to perform the function inadequately.  Rather, it is discretion to choose among *reasonable* means of excluding expertise that is fausse and science that is junky.  Though, as the Court, make clear today, the *Daubert* factors are not holy writ, in a particular case the failure to apply one

> or another of them may be unreasonable, and hence an abuse of discretion.

*Id* at 1179 (Scalia, J., concurring).  Taken together, the majority opinion and concurrence, sends a strong message that Rule 702 imposes a substantial obstacle to the use in Federal trials of questionable testimony by self-designated experts.

As stated, *Kumho Tire* allows non-scientific expert testimony, i.e. testimony expressly not grounded on scientific method, but on personal experience and long term observation.  However, the challenge in experience-based-knowledge lies in stating clearly the events that are associated and describing how one event eliminates possibly confounding events.  To validate that experience-based-knowledge, the *Kumho* Court held that the expert must be able to describe clearly how he is able to exclude other possible causes of the blowout based on examination of the tire.  Reliability of the method and conclusions turn on the clear and objective explanations, and not simply generalized conclusions that based upon the expert's experience of a particular fact or opinion exists.

In *McClain v. Metabolife International, Inc*., No. 203-12776 (11th Cir. March 2, 2005) the Court reversed a District Court's jury verdict on the basis that certain expert testimony should not have been allowed into evidence dealing with medical causation in a products liability case.  The Court found that the Plaintiffs' experts' testimony on medical causation lacked reliable foundation for admission of evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).  The Court stated that when a party offers expert testimony and the opposing party raises a *Daubert* challenge, the trial court must make certain that the expert, who is basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.  *Id*. at p. 5, *citing Kumho Tire*

*Company v. Carmichael*, 526 U.S. 137, 153 (1999).

As noted previously, experience in a field may offer another path to expert status. *United States v. Frazer*, 387 F.3d 1244, 1260 (11th Cir. 2004). However, simply stating that one's opinion is based upon a general claim of one's experience is not sufficient. The Court in *McClain v. Metabolife International, Inc.,* No. 203-12776 (11th Cir. March 2, 2005) stated that the Plaintiff's expert attempted to "anoint his opinions by claiming that he based them on 'broad principles of pharmacology'" *Id*. at p. 21. In the *Daubert* context such vague, broad brush statements have little value. *Id*. They are not "shibboleths" to distinguish the experts that offer reliable science from those who voice junk science to the Court. *Id*. at 21-22. An expert's assurances that he has utilized generally accepted methodology insufficient. See *Moore v. Ashland Chemical Inc.,* 151 F.3d at 276, C.A.5 (5th Cir. 1998). Nothing about *Daubert* requires the Court to admit evidence that is connected to existing data only by the *ipse dixit* of the expert. *McClain* at p.22. The gatekeeping function of the Court requires more than simply taking the experts word for it. Fed. R. Evid. 702 Advisory Committees Note (2000); *McClai*n at p. 52.

The Court must do a preliminary assessment of whether the reasoning or methodology underlined in the testimony is scientifically valid and whether the reasoning or methodology properly can be applied to the facts in issue. *Daubert* 509 U.S. at 593. The proposed testimony must arrive from scientific method; good grounds and appropriate validation must support it. *Id*. at 590. The Court must consider the testimony with the understanding that the burden of establishing this qualification, reliability, and helpfulness rests upon the proponent of the expert. See *United States v. Frazer* 387 F.3d 1244, 1260 (11th Cir. 2004).

Where the expert failed to articulate tests, methodology, and techniques used by the

investigator in investigating a fire claim, the Court excluded the expert in *Michigan Millers Mutual Insurance Corporation v. Benfield*, 140 F.3d 915 (11th Cir. 1998). The Court criticized the investigator who took no tests and samples, and was unable to explain the methodology in which he eliminated the chandeliers, as a possible ignition source of the fire. *Id.*; see also *Donnelly v. Ford Motor Company*, 80 F. Supp. 2d 45 (E.D.N.Y. 1999).

In *General Electric v. Joiner,* 522 U.S. 136, 144 (1997), the Court states that there must be both a reliable methodology and a reliable application of the methodology. The expert must be able to explain how and why he reached his opinion. Just because a well-trained expert says something does not make it so. An expert may not look at data and simply *ipse dixit* of the expert generate an opinion.

Also, factors to consider regarding expert's methodology are those announced in the Third Circuit case of *In re*: *Paoli Railroad Yard, PCB Litigation*, 35 F.3d 717, 742 (3rd Civ. 1994) whether the method consists of testable hypothesis, whether the method is subject to peer review, the known or potential rate of error, the existence in maintenance of standards controlling the techniques operation, whether the method is generally accepted, the relationship of the technique to the methods that have been established to be reliable and the qualifications of the expert testifying based upon methodology and the non-judicial uses to which the method has been put beyond these proceedings. The Court should also consider whether the expert claims are a testable hypothesis and whether he has failed to test it, whether the expert who acknowledges the existence of standards controlling his discipline methods can pinpoint actual standards he followed, whether the expert has any real world experience relevant to the subject of the proposed testimony, whether the expert is merely offering opinions specifically tailored to litigation, whether the expert is reasonable in considering the facts,

-8-

whether views and conclusions contrary to proffered opinions are considered, whether the expert is expressing bottom line opinions without adequate factual and methodical support, whether the expert can explain his methodology beyond his own intuition or *ipse dixit* or whether the expert is simply stating the obvious, expressing opinions that any non-expert could easily espouse.

**B.    Eleanor Posey**

Ms. Posey's report and her deposition demonstrate that her testimony in this case violates the *Daubert* requirements of qualification, relevance and reliability for expert testimony.  Her testimony is due to be excluded under Rule 702 of the *Federal Rules of Evidence* and the *Daubert* line of cases.

Ms. Posey was originally tendered in this case as an electrical engineer expert early April, 2003.  She has a degree in such but has no work experience as a practicing engineer. (Posey's Curriculum Vitae, Exhibit "A").  She has been a professional witness her entire career (Exhibit "A"; Posey's Deposition and Trial Testimony for last 4 Years, Exhibit "B").  Ms. Posey is now being tendered in the latest report she has filed as a cause and origin expert.  (See Report, Exhibit "C", dated December 20, 2004 (actually the report is dated December, 2003 but this is a typo according to Eleanor Posey (Eleanor Posey's Deposition, Exhibit "D", pg. 359)).  She has no practical expertise as a cause and origin expert.  Her experience has been allegedly accumulated over time as a professional witness. (Exhibit "A", Exhibit "B").  She lists no experience as a firefighter, working as a fire investigator for a government or agency, or insurance company, or any type of similar work. (Exhibit "A").

In *Pires v. Honda Motor Company*, 31 F.3d 543, 546 (7th Cir. 1994), the Court stated we find it "comforting to see experts with analysis derived independently rather than parroting consistent 'often bogus' theory concocted by counsel."  The 4th Circuit has testified that it is absurd to conclude

-9-

that one can become an expert by accumulating experience and testifying. *Thomas J. Klin*, *Inc. v. Lorillard, Inc.*, 878 F.2d 791, (4th Cir.1989).  See also *Buckman v. Bombardier Corp.*, 893 F. Supp. 554, 556 (E.D.N.C. 1995).  Other than her *ipse dixit* declarations and work as a professional witness, Ms. Posey cannot point to work as an actual fire investigator for a government agency, a firefighter, or any similar practical experience.

In the case of *Way v. State of Florida*, 760 So.2d 903 (Fla. 2000), the Court heard an appeal from the Circuit Court in Florida where the petitioner had been sentenced to death.  Ms. Posey's testimony was put forth as an argument to set aside the conviction.  The Circuit Court wrote a lengthy opinion about her work which was affirmed by the Florida Supreme Court.  The Court stated as follows:

> "the opinion of fire expert Eleanor Posey defies logic, it is inconsistent with the physical evidence at the fire scene and as refuted by the testimony of on-scene investigators and an electrical engineer. . . no rational juror could have found a reasonable doubt based upon the testimony introduced by a petitioner at the evidentiary hearing.

*Way*, 760 So.2d at 909-910

The conclusion drawn by the court in *Way v. State* could easily be a summary of Posey's testimony in this case.  Posey's opinions defy logic, ignore the testimony of her client, Matthew Cochran, are refuted by on-scene investigators and an electrical engineer and veer into fields and opinions she has no academic and practical backgrounds and that have no scientific or technical basis. Furthermore, Ms. Posey has been the subject of complaints made against her with the International Association of Fire Investigators. (IAAI Notice of Compliance with Records Subpoena, Exhibit "E").  An important initial problem with Posey's testimony is that her report copies the

report of her husband's previous report[1] verbatim, as if it were generated by cutting and pasting his report to hers rather than stating independently considered opinions. (Posey depo., pp. 206-212; Exh. C, pp. 13,19-20, 50-57; Exh. H (James Posey's Report), pp. 3-11).  This parroting of the report of her husband goes as far as indicating she conducted certain inspections and made certain findings that she did not. (Posey depo., pp. 208-209). Further, she admitted that the attorney for the Defendants assisted in the preparation of the report by typing the report for her, and the report on its face indicated that before she ever began as an expert in the case that she had received filtered information from her husband who had been retained as an expert in the case and that based upon this information she formed opinions before becoming a retained expert in the case and undertaking her own investigation. (Posey depo., pp. 229-231; Exh. C, pp. 5-6, Affidavit of 4/03). These facts along with her background as a professional witness greatly weigh against her opinions reliability.

Courts look to see if there is some independently held opinions of an expert rather than something that is parroting Plaintiff's counsel. *Daubert*, 43 F.3d 1311 (9th Cir. 1995).  The central feature of *Daubert* and *Kuhmo* cases is that safeguards should be put in effect to show independence and the reliability of the expert's testimony.  On page 5 of Posey's report, Exhibit "C", Posey states that prior to becoming an expert in this case and undertaking any investigation, she became aware of many aspects of the fire that occurred on November 11, 1998 at Foreign Auto Parts through conversations with her husband who had been retained as a consultant and later as a testifying expert. *Id*.  She had formed an opinion that there was extremely troubling miscarriage of justice occurring and volunteered her services on electrical fire causes among other things. *Id*.  These opinions would

---

[1] James Posey, her husband, was an expert/consultant in this case for Cochran prior to Eleanor Posey being an expert and produced a report provided in this case as well as gave a deposition.  He was rendered as a cause and origin and insurance bad faith expert by Cochran.

have been formed prior to the depositions taken of Cincinnati's fire investigator, Anthony Fischetti, and experts Owen Posey and Harold Deese. (Posey depo., pp. 223-224). As outlined in more detail later, these opinions would have been formed prior to her doing any type of investigation, such that she did, in reviewing the information that she reviewed. (Posey depo., pp. 225-227). Posey cannot say what information she got from her husband or what formed the opinions she developed prior to being retained in this case. (Posey depo., pp. 220, 223, 229-231).

Further, the limited amount of information she reviewed further demonstrates that the opinion was bias from the beginning and then continued. Eleanor Posey admitted that she has interviewed only one witness and that was in January of 2005 after her report (Posey depo, pp. 20, 108, 111). She has spoken to Mr. Cochran a few times but has no notes of those conversations and interviewed no other witnesses in the case. (Posey depo, pp. 103, 100, 109). As shown in Cincinnati's Motion to Reconsider Denial of Summary Judgment (Doc. 236) which for purposes pertinent of brevity will not be reiterated in full in this motion, there were numerous individuals who had information regarding this fire, such as Mr. Preston who was with Mr. Cochran when he was arrested, statements of Mr. Burroughs who witnessed Mr. Cochran leaving the scene, fire investigators who investigated the fire beginning the night of the fire on through Mr. Cochran's criminal trial for the State of Alabama, police officers who took the statements of Mr. Cochran, (none of these statements appear in Ms. Posey's file and she has no documentation that she reviewed any of them (Posey depo., pp. 19, 182-183, 185, 303-305) [review of her deposition testimony regarding statements that Mr. Cochran had made to the police as to different ways the fire began that night also shows that she had no clue of what he had told the police (Posey depo, pp. 182-184)].

-12-

In Eleanor Posey's deposition she admitted that she kept no notes even though her normal practice is to keep notes of the information she gathers.  (Posey depo, pp. 16, 18, 103, 65, 69). During her deposition different materials were in the wrong files.  (Posey depo, pp. 79-80).  Posey could not find the trial testimony of Deese and Owen Posey, the experts for the Plaintiffs, although she claims she had reviewed their testimony and even though she had no actual documentation of the materials which were not in her files. (Posey depo, p. 68).  Ms. Posey could not recall whether she reviewed certain affidavits that were attached to her disclosures as if she had relied on them. (Posey depo, pp. 17-18).  She admitted that the materials listed at the end of her report do not list all the materials that she may have actually looked at and are not all in her file.  (Posey depo, p. 98). Therefore there can be no independent verification of what information she had in rendering her opinions in this case.  Her inspection of the premises involved in this case lasted approximately two hours (Eleanor Posey, p. 119).  She was given a cord that she was told was involved in the fire and was located at the place where the fire began.  (Posey depo, pp. 120-126).  There was no chain of custody provided to her and she was unfamiliar with the chain of custody for this cord.  It was not labeled as her normal practice would be. *Id*.

She never read Emanuel Cook's affidavit.  (Posey depo, pp. 110, 179).  As stated in Plaintiff's Motion for Reconsideration of Its Denial Summary Judgment (Doc. 236), Emanuel Cook testified that from the very night of the fire the Fire Marshall's office believed the fire to be suspicious and that he took samples that night which tested positive.  She seemed in her report to try to indicate that the Fire Marshall's office did not think the fire was suspicious (Exh. C, p. 18) but both Emanuel Cook and later Larry Hansen with the Fire Marshall's office all believed the fire to be suspicious.  Hansen has provided testimony in Cochran's criminal case that he believed the fire

-13-

to be intentionally set with multiple points of origin. (Trial testimony of Larry Hansen, Exhibit "F", pp. 352, 367). Hansen likewise took samples of the fire that came back positive for accelerates. (Hansen's Report, Exhibit "G", p. 10).

Posey cannot say whether she read Cochran's examination under oath he gave to the insurance company which contained his statements as to how the fire occurred. (Posey depo, p. 184). Posey never interviewed Mr. Perryman. He was the owner of the building. Again, the police reports and fire reports are not contained in the file and she has no documentation that she ever looked at those reports. (Posey depo, p. 228). Posey had no clue that Larry Hansen, the Fire Marshall, found that some samples did not have medium petroleum distillates in it and some did. (Posey depo, p. 235). This is important because Posey criticizes Deese and Cincinnati for not having comparative samples in the office stating that if there were such and those samples showed a lack of medium petroleum distillates then this would be more indicative of an accelerate being put in the room. (Posey depo, pp. 235, 237). This selective and subjective consideration of some evidence but not of all evidence in order to parrot a party's theory is the very thing *Daubert* and its progeny were set up to prevent.

If Ms. Posey, as it appears, is rendering opinions based upon information provided to her by her husband and provided to her selectively by Defendant Cochran, there is a question of the reliability of such a subjective process. There is no validation possible in this matter because Posey kept no documentation of the information received or considered. She rarely refers to cites anything to support her statements of facts and opinions. Information selectively produced or obtained through counsel provides bias opinions and less reliable opinions due to the subjectivity of the limited information. See *Staggs v. Commonwealth of Kentucky*, 877 SW.2d 604 (1993). *Daubert*

-14-

makes it clear in its testing factor for reliability that if the methodology is not susceptible to any objective validation of testing then such subjective methodology is less reliable.

Quite disturbing with Posey's report is the wholesale copying of portions of her husband's report that was prepared January 29, 2002 [by James Posey] and placed into her report she submitted in December of 2004.  Attached as Exhibit "H" to this Motion is a copy of that report by her husband on January 29, 2002.  Highlighted are those statements that are verbatim to Eleanor Posey's current report prepared in December of last year for this case.  Written to the side are page numbers of the corresponding pages to Eleanor Posey's report.  These statements, conclusions and opinions would have been completed prior to Eleanor Posey ever being involved in this case and her alleged investigation in the case.  This coupled with her earlier statements about her predisposition toward bias and her obvious filtering of the information she received points to the worst things that *Daubert* is geared to prevent.  One of the most glaring examples of this parroting of a theory is found on Page 53 of Posey's report which is copied from Paragraph A to page 8 of her husband's January 29, 2002 report.  In that report she states and her husband stated: "I found 11 circuit breakers 'tripped' on the electrical panel which was located too far from the area of the fire for the heat of the fire to explain why they were tripped."  Eleanor Posey testified in her deposition that she never examined the breakers in that manner and found no tripped breakers. (Posey depo, pp. 110-112, 208-209).  She is obviously presenting as something she found, something that her husband purportedly found.  She also attempts to state: "to me this appears that the insurance company was considering denying Mr. Cochran's claim even before their electrical expert, Owen Posey had been to the scene."  (Posey depo., p. 57; Deposition of James Posey, Exhibit "I", p. 11).  In this incident she is attempting to promote herself as a bad faith claims handling expert.  She has no experience in claims adjusting or

claims handling.  The statement is blatantly subjective  guess work and speculation, but for Eleanor Posey to attempt  to promote herself as a bad faith insurance expert or even rendered such an opinion is indicative that she will say whatever is necessary to promote the case as an advocate of the person who hired Ms. Posey rather than an independent scientific or technical expert.  When asked directly, Posey will say that she is not a bad faith claims expert (Posey depo., p. 213), but Defendants' expert designation in the pretrial order states that Defendants' will offer Posey as such.  Further, Posey will try to circumvent her lack of qualification as such by saying she is criticizing the "investigation" not "claims handling".  However, her criticisms parrot her husband's criticisms as a bad faith expert.

Posey further testified that her report was prepared with the assistance of counsel.  (Posey depo, p. 205).  She denied copying her husband's report  (Posey depo, p. 206), but a comparison of the reports lead to the opposite conclusion. (Posey depo., pp. 206-207).   Her denial of copying her husband's report certainly undermines her credibility further.  All the factors show a bias and lack of independence on the part of Eleanor Posey that should disqualify her from testifying under *Daubert* and *Rule 702*.

However further, like in the *Way* case, her conclusions and testimony in this case defy logic, are inconsistent with physical evidence on the scene and are refuted by the testimony of on-scene investigators and an electrical engineer. (See Evidentiary Submission Motion to Reconsideration of Summary Judgment, Doc. 238).

In *McClain*, one of the Court's criticisms was that the expert did not follow the basic methodology of the experts in that field.  *McClain* at p. 11.  Further, the Court criticized the expert for using vague generalizations to justify opinions and not having specifics to the particular case. *McClain*, p. 12.  The Court also criticized the expert for not having the medical literature that

supported their opinion or relevant standards in the industry.  The Court criticized any assumptions based upon false inferences that a temporal relationship proves causation.  *McClain* at p. 19.  Expert opinions must be based upon logical assumptions not illogical assumptions and cannot be based upon guesses and speculation.  The Court noted in *McClain* that the expert failed to look at large amounts of data that existed on the subject and provide some materials from scientific publications that support their opinion.  *McClain* at p. 21.  The Court noted that *Daubert's* requirement that an expert testify to scientific knowledge -- conclusions supported by good grounds for each step in the analysis - - means that any step that renders the analysis otherwise the expert testimony inadmissible. *McClain* at p. 23.  The *McClain* Court also noted that uncontrolled anecdotal information offers one of the least reliable sources to justify an opinion by both general and individual causation.  *McClain* at p. 34.  An expert's personal beliefs ought not to be substituted for actual evidence.  *First United Financial Corp v. US Fidelity and Guaranty Co*, 96 F.3d 135 (5th Circuit,1996) at 136.

Eleanor Posey's report is 104 pages long and her deposition is 400 pages long.  However an examination of her report and deposition shows that there is very little in the report or deposition other than generalizations unsupported by any treatise, documented facts, or other relevant authority. It has already been stated what information that she ignored or cannot document that she reviewed. It has also been stated what she simply copied from her husband's reports.  Posey cites standards such as "NFPA 921 and some other forensic ASTM Forensic Science Standard Packages" but she does not provide much in the way of how those practices interrelate with what occurred in this particular case.  There are no studies, no scientific principles, no treatises put forth in Posey's report or deposition, just generalizations and conclusions.  A comparison of the factual claims in Posey's report and deposition testimony to the materials Plaintiff's submitted in support of the Motion to

Reconsider Summary Judgment, (Doc. 238), shows that Posey's testimony is contrary to various Fire Marshals who were on-scene investigators, Harold Deese who has his experience as a Fire Marshall before working as a fire investigator in the private sector, electrical engineer Owen Posey, Police Investigators, eye witnesses to the fire, and most interestingly, Cochran's own testimony.

Eleanor Posey's theory outlined in her report and deposition are that the fire must have actually been in place for a long period of time but have gone unnoticed by Mr. Cochran. She claims that the fire was burning for a good bit of time, weeks, maybe months. (Posey depo., pp. 241, 281, 284). She states that the fire would not have occurred at the computer as Cochran told the police in one statement (Investigating Officer Smith's Statement of 11/12/98, Exhibit "J"; Posey depo., p. 282) or that it would have occurred due to the flipping of the light switch as Cochran described (Posey depo, p. 278). Cochran's story in his EUO and parts of the police report were that he came in the building saw absolutely no fire in the room or light indicating the fire in this dark room that was an office, flipped a light switch, and flames instantaneously came either from the computer (one story), under the computer desk (one story), or from behind and in front of the computer desk (another story). (Exh. "J"; Cochran's EUO, Exhibit "K", pp. 210-214; Cochran's Statement of 11/11/98, Exhibit "L"). These flames burst up the wall to the point that they were now engaging wood and other materials in the fire. (Posey depo., pp. 279, 281-283). This simply cannot happen without an accelerate. (Posey depo., pp. 288-289, 300-301). Posey's attempt to get around Cochran's statements is to claim that the fire really was going on for a long period of time, maybe months and that it only grew to the size that Mr. Cochran described the moment he walked into the room alone, late at night on November 11, 1998.(Posey depo., pp. 241, 281-283). This was all matter of coincidence and ignores her own client's statements.

-18-

Posey admits the flipping of the light switch by Cochran did not cause the fire although Cochran ties those two together (Posey depo., pp. 278-282).  She attempts to sell, in support of her strange theory, the idea that this fire would have gone on for a long period of time, maybe months without any employee (who regularly uses that office each day) smelling anything burning (Posey depo., p. 242).  Posey also tries to sell the idea that there would have been no light visible to Cochran.  Just like the *Way* case, Posey's theories defy logic and are obviously contrived to make the best of Cochran's statements in his EUO and to the police.  An interesting illustration of Posey's willingness to say whatever needs to be said to make her case was when she was confronted with Cochran's statements to the police which she obviously did not have in her file to review.  Posey tried to say that the police did not know how to take down a witness statement.

> Q     Will you agree with me that if there is a statement by Mr. Cochran that he entered the room, saw no evidence of a fire, turned on the light switch and immediately there was a four-foot flame underneath the desk or out of the computer, that what you have observed would – – in looking in these photos, making your investigation, you would not agree with that scenario?
>
> A     You show me that statement.  You show me that statement. That's not what that statement says.  You show it to me.  I want to read that statement before I answer that question.
>
> Q     I am asking you, though assume for me —
>
> A     You're assuming what--your basis of your thing is not in what I  looked and read at — Excuse me, looked at and read in this case.  So you show me this statement and I will look at it and answer you.
>
> Q     What part?
>
> A     You said that Cochran doesn't see a fire and then he turns the light on, and you're implying that only after he turns on the

light does he see any flames or any sparks.  Your implication
is not what I think happened, and I don't think it's what Mr.
Cochran said.

Q       Forty-five is a statement, summarized, taken by Police Officer
R. Smith.  And it says: "Matthew Cochran, business owner,
who stated to police that he went to the business, turned on
the lights, and his computer began to spark, and flames began
shooting out."  He stated he ran and saw one of his
employees.  Take a look at that.

A       This is ---.  Okay.  I was going to say to you first of all —

Q       You asked me to show me your statement.  I am showing it to
you.

A       Well okay, but let me say this.  I'll bet you that Mr. Cochran
never read that statement and said and that's what I said.

Q       So you think —

A       **And I do not think a police officer is necessarily qualified
to write down relevant things, observations from a fire**.

Q       Do you think he's qualified to write down what Mr. Cochran
said?

A       He might be if he did.

(Posey depo., pp. 267-269).

It makes it quite clear that anytime any information is not favorable to Eleanor Posey's theory

then it is simply eliminated, *ipse dixit*, for no objective or substantiated reason.  Eleanor Posey was

obviously unaware of Mr. Cochran's statement because she received information in a filtered and

strained manner.  However, once confronted with it her reply was the police officers did not know

how to take down statements of witnesses.

-20-

This exchange is indicative of the silliness of Posey's testimony and her evasive nature as a witness.  Posey provides in her 104 page report and several hundred page deposition generalizations, vague answers, avoiding answers, no proof, limited facts considered, or when asked a direct question refuses to answer and when confronted with information that does not fit her theory, she just discounts it by saying that police officers cannot take down statements.  Her testimony is nothing short of ridiculous.

When confronted with evidence of  Mr. Cochran's statement that his story of how the fire occurred could not have happened outside an accelerate, she simply created an imaginary set of facts that this fire actually was burning for months underneath the desk, in an office with people in it constantly, emitting no odor, no light, and the night in question when Mr. Cochran entered the room he saw no light from a flame until he flipped on a light switch and the flame coincidentally at that time burst into a four foot flame burning a wooden desk and walls.  In order to make the theory work Posey speculates that there must have been post-it notes, dust, and all types of other materials behind the desk that would have provided the basis for the fire to grow.  She proclaims this opinion *ipse dixit*. (Posey depo., pp. 285-286).  She has no facts or evidence to base this newest assumption on, nothing but pure speculation, because the speculation is needed to help her further speculative theory work.

Posey theories explained in her report and deposition about the presence of accelerate in the building are also speculative.  She attempts to criticize Laurel Waters who tested samples from the building and found the presence of medium petroleum distillates and also testified in her expert opinion that these samples could not be the result of tracking.  Although Posey has no qualifications or background to criticize Waters regarding samples, tracking, or any chemical tests, Ms. Posey, the

electrical engineer, has no trouble in offering criticisms and opinions on these subjects just like she would attempt to testify as a bad faith expert, fire cause and origin, psychologist, or any other type of expert that Defendants need.

Posey makes numerous criticisms of Harold Deese and Owen Posey about their investigation. As shown and stated earlier much of this is copied from her husband's report. (Posey depo., pp. 206-212).  Posey criticized them and Cincinnati for not finding out about a supposed flood that occurred on the property and the presence of WD-40 being sprayed over the property after a hurricane flood occurred.  This new theory pops up in her disclosures in December of 2004 but was never presented in the criminal trial by Cochran, Cochran's EUO, or any of Cochran's interviews with Cincinnati, Deese, or Posey where he was asked about what might have lead to the presence of these medium petroleum distillates being present in the room. (Posey depo., pp. 347-349). Posey claims Cochran told her about this.  One wonders what Ms. Posey expected to be asked by the insurance company investigator or experts or the police or fire investigators of Mr. Cochran in order to find out about his theory that the hurricane flood waters pushed medium petroleum distillates throughout the building and that employees had sprayed the room with WD-40 after that flood.  One does not usually ask if this room has been flooded by a hurricane recently or if they had sprayed the room down with WD-40.  Cincinnati and Deese asked whether such non-medium petroleum distillates got in the room, and how was the room used.  Apparently this is a new theory years after the fire.  In order to turn the matter around Posey claims that Cincinnati was deficient for not asking about the hurricane or the WD-40, rather than deal with the fact that Cochran has just recently produced this information after all these years, many proceedings and sworn testimony.

Posey makes a number of criticisms about alleged spoiled evidence.   Posey has failed to go

to the D.A.'s office to see what materials were introduced into evidence there.  Posey has criticisms about certain sockets not being preserved by Owen Posey.  (Posey depo., pp. 262, 329).  Owen Posey introduced certain materials into evidence at the criminal trial. (Trial Testimony of Owen Posey, Exhibit "N ", p.  17).  These matters were reviewed by Posey's husband prior to the criminal trial.  (Exh. "N", p. 29).  Posey fails to state in her report that the materials she produced for inspection at her deposition was one of these sockets or brackets for the socket that she claims was spoiled.  How this came into her possession she could not explain other than she received it from counsel for Defendants.  It would appear that Defendants would accuse Plaintiffs of spoiling evidence which is in the possession of the Defendants.

Because of the volume of these vague unsupported statements that are made by Posey, it is very difficult to address each and every point.  Some examples are illustrative of the overall problem.  On page 10 of her report, Posey lists a number of conclusory statements without anything to back up the conclusions factually or providing an analysis.  For instance, she states in these conclusions that spraying of WD-40 may have caused this problem.  One, she is not qualified to provide any type of testimony of that nature.  Two, she does not quantify how much WD-40 it would take in order to produce these samples or exactly where all the WD-40 was sprayed and what amount of that WD-40 would be required to produce these samples. (Posey depo., pp. 308, 312-313).  Posey cannot testify that WD-40 would produce those samples based upon her background experience.  There are no verifiable tests, no quantitative analysis, but simply a *ipse dixit* conclusion provided.  In  another example, Posey concludes that where an extension cord is found trapped under the left rear corner of a two-drawer metal filing cabinet there was a charred carpet track.  Posey blames this cord as being the cause of the fire. (Exh "C", p. 10). Posey did not find this cord or find this carpet track

burn.(Posey depo., pp. 134-136, 153-154, 174, 186-187, 385).  Posey did not inspect the premises. She bases these on various pictures identified in her deposition. (Posey depo., pp. 126-127, 134-135). Posey was handed a cord without any established chain of custody by Cochran who claims it was found later by the Defendants' friend. (Posey depo., pp. 121-122, 124, 126). No one can look at the cord she has and the pictures she relies upon and say the card is one in the same or how the cord was positioned in relation to the cabinet. (Posey depo., pp. 133-135, 259-260).  She ignored testimony of Harold Deese and Owen Posey that the cord from that area was tracked and found as not being the electrical cause of the fire. (Exh. "N", pp. 11, 13, 20-21, 28; Trial Testimony of Harold Deese, Exhibit "O", p. 165, 180-181, 196-198).  In her report Posey states on page 18 there was spoliation of evidence but she provides no explanation for what this means in her report.  Pages 10-13 have no citations, analysis or authority.  Posey's statements in the first paragraph on page 13 of her report contradicts the above-stated testimony of Cochran.

On page 13 the second paragraph Posey attempts to state that Mr. Cochran's behavior in this fire was in keeping with her experience of fire victims.  She relies on no scientific study, she has no background in psychology and there is nothing in her analysis that even comes close to the requirements of the *Daubert* cases cited above for reliability. (Posey depo., p. 302). Posey's opinion is unverifiable, *ipse dixit*.  This again is another example of how Posey will venture into whatever area she needs to be an expert.  Posey's opinion copies her husband's opinion as well when he tried to offer similar opinions.  On Page15 Posey cites various things she considered but gives no specifics to the conclusions drawn.  On Page 17 Posey goes on about how Cincinnati did not have the proper documentation of its investigator and ignores the fact that she absolutely kept no notes of any of her investigation such as it was. (Posey depo., pp. 16-20, 55, 64-65, 110, 118-119, 136). Posey kept no

-24-

notes of any interviews she made with anyone relevant to this case. (Posey depo., pp. 39, 66, 101-103, 109, 117, 119, 136, 185). Posey has no documentation of what she considered or how she arrived at any of her conclusions. (Posey depo., pp. 37-39).  On page 17 Posey claimed that Deese, Owen Posey and Cincinnati Insurance Company did not conduct a fire investigation at all, but labeled the incident arson and then did not follow N.F.P.A. 921 Guidelines for investigations.  Posey claims the critical evidence was never sought out, spoiliated, suppressed or offered. (Posey depo., pp. 322-350). This statement is vague and contains no specifics as usual.

Posey's deposition provided little more evidence was spoiled she claimed because diagrams had north rather than west on diagrams (even though we can tell what area the diagram is showing), that this is spoliation.  She claims that the electrical wire that was removed by Owen Posey or according to Cochran - Harold Deese; did not cause the fire, but it still was spoliation to remove it. Posey does not claim Deese spiked the scene. (Posey depo., p. 234).  She does not back up these assertions with any authority and none of these alleged spoliations are relevant or show anything - - even spoliation in legal sense.  Further, Posey fails to note that Harold Deese actually interviewed the witnesses to the fire, examined the fire scene at the time of the fire, interviewed various governmental investigators investigating the fire or that Cincinnati talked to the different witnesses to the fire, communicated with the police and the fire investigators about their findings, obtained information from Harold Deese the cause and origin expert, and Owen Posey, electrical engineer, had samples tested and documented those parts of the investigation.

On the other hand, Eleanor Posey came in the case years later with a predisposition before investigating the case based upon filtered information from her husband, interviewed one witness and that was in January of 2005 after she had rendered her opinions in a report of December, 2004,

talked to some other people but never took notes, never documented the information, and ignored

vast amounts of information and provided no documentation regarding what she considered and what

she did not consider.  Posey's file did not have critical depositions or documents relating to

investigations in it and she could not explain why it did not.  Posey was unaware of who made the

affidavits that were attached to her disclosures of December of 2004.  The reliability and credibility

of her opinions are nil based upon these factors.

Page 18 of Posey's report contains another statement that illustrates the filtering information

she received and the erroneous conclusions drawn from it.  On Page 18, Posey states:

> "On November 12, 1998, the Fire Marshall came to the scene, found
> nothing unusual and released the scene to Mr. Cochran."

As stated earlier, Ms. Posey never considered the affidavit of Emanuel Cook who was the first fire

investigator for the Fire Marshall's office on the scene the night of the fire.  On that date, Cook's

affidavit states clearly that the fire was suspicious from the beginning and the Fire Marshall's office

took samples that came back positive. (Cook's Affidavit of 6/3/03). Posey's report also ignores the

testimony of Larry Hansen, a Fire Marshall investigator who concluded that this was a set fire. (Exh.

"G").  Rather, Posey bases this conclusion apparently on some affidavit by an individual who

provides a hearsay statement that the fire at the scene must have been released (Letter of Wayne

Dean, Exhibit "P").  She was unaware of Cook's affidavit because she was not provided the affidavit

even though the Defendants have had it for years.(Posey depo., pp. 179-180). This illustrates a

problem with Posey's testimony, credibility and reliability.

Because of the length of the 104 page report, and the deposition, it is too difficult to go over

all these other numerous examples.  However, a comparison of her deposition, her report, and the

-26-

materials submitted in Plaintiff's Motion for Reconsideration of its Summary Judgment make it clear that Posey's testimony lacks the reliability and relevance required by *Daubert*. As the Courts stated in *McClain*, the Court must make a very detailed thorough searching of these materials as a gatekeeper for this type of expert testimony. Plaintiff will submit to the Court that such consideration on what has been presented to the Court and a consideration of the whole of the deposition will illustrate to the Court that Eleanor Posey is simply parroting the theory that works best for Defendants regardless of whether that theory has any basis in fact, science, is within her qualifications, or whether there is any reliability to support it.

Plaintiff also moves in limine to not allow Ms. Posey to show certain video tapes or show a video tape containing experiments. She has testified that the wiring in only three of these multiple tests shown in the video is the same type wires that were involved in this fire. It appears that the test was done as a demonstration for a class she was teaching and was not done based on any type of standard to insure that the condition shown in the experiments were exactly the same conditions that were present at the fire in this case. (Posey depo, pp. 35, 42). Posey indicated the tapes did not involve any medium petroleum distillates which were present in the materials that were involved in the fire that is the subject of this lawsuit. (Posey depo., p. 48). She took no measurements of heat or other similar factors for these experiments and could not say if those conditions were the same as the fire which is the subject of the lawsuit. *Id*. In the tape which is submitted as Exhibit "Q" to this motion Posey did experiments by placing wire in burning wood. (Posey depo, pp. 41-50). The fire that is the subject of this lawsuit, Posey claims was a smoldering fire that lasted several months. It occurred due to the wire being rubbed against metal then igniting desk post-its and other materials behind the back of the desk and eventually igniting the wood. The various fires in the video and the

conditions she claims occurred at the Defendants' business are totally different.  Based upon the law

submitted in the other motions Cincinnati filed regarding videos that the Defendants wish to show

to the jury, Cincinnati believes these video experiments are due to be denied being admitted into

evidence.  Also, Plaintiff would submit that based upon the *Daubert* standards these videos should

be not admitted into evidence.

**C.    James Posey**

James Posey is offered as an expert for the cause and origin of the fire and as a bad faith

expert for claims handling.  He has given a deposition which Defendants may attempt to read into

evidence.  That deposition is submitted with this motion as Exhibit "I".  Posey's testimony about this

case can be summarized as follows:  James Posey makes criticisms of the adjustment of claim and

the investigation of claim.  (J Posey depo., p. 30).

Mr. Posey claims Harold Deese should not have removed the cords before Owen Posey had

an opportunity to examine them.  (J Posey depo., pp. 29-31). However, Edward S. Paulk, Assistant

Alabama State Fire Marshal, stated it is not necessarily improper to remove evidence from a scene

in order to preserve it.  (Edward Paulk Deposition, Exhibit "R", p. 40). Posey continues to criticize

the adjustment and the investigation of claim for failing to list Mr. Perryman as the lost payee.  (J

Posey depo, p. 31). Mr. Posey is  also critical of the adjustment and investigation of the claim

because (1) nobody witnessed Mr. Cochran's signature or (2) the agent did not sign the policy.  (J

Posey depo., p. 32). In addition, Mr. Posey believes Cincinnati's retention of Richardson's firm

shows an intent to deny the claim.  (J Posey depo., p. 33). Mr. Posey states he does not have any

evidence to support this claim; it is speculation.  (J Posey depo., p. 34). Posey also claims Deese's

removal of electrical appliances  destroyed any available subrogation claim or any insurable loss Mr.

-28-

Cochran may have maintained.  (J Posey depo, p. 34). None of these suspended wrongs can explain how they may have led to a wrong conclusion about the claim by Cincinnati or have anything on the case.  These speculations lack relevance under *Daubert*.  Further, each speculation ignores the facts of the case and there is no verifiable and reliable basis for the opinions.

Mr. Posey faults Harold Deese by failing to take comparison samples.  Mr. Posey, when asked, also testified he did not take comparison samples.  (J Posey depo., p. 34). Mr. Posey believes Cincinnati should have considered the possibility an intruder was hiding in the building when Mr. Preston and Mr. Cochran initially left.  (J. Posey depo., p. 34).  Nonetheless, Mr. Posey  states that, although inept, Cincinnati had a debatable reason to deny the claim.  (J. Posey depo., p. 40). Mr. Posey also testified that whether or not Mr. Deese took anything from the scene did not affect his ability to render an opinion as to what caused the fire.  (J. Posey depo., pp. 60-61).  Posey's position is that the fire was caused by an arcing fault. (J. Posey depo., pp. 96-97).  A short circuit was then created by either heat from the arcing fault, causing the wire and its insulation and sheathing to disintegrate, or by the vibration from opening and closing the file cabinets.  (J. Posey depo., p. 97). According to Mr. Posey the short circuit probably ignited the carpet.  (J. Posey depo., p. 97).  Mr. Posey states Mr. Deese found the presence of medium petroleum distillate, such as mineral spirits, brake fluid or other accelerates, because you would expect to find those in a shop. (J. Posey depo., pgs. 41, 69).  This testimony does not dispute that accelerates were found all over the shop by Mr. Deese and Larry Hansen (Doc. 48, Ex. "I"; Ex. "A" and Bates Nos. 4807-4808).  Mr. Posey's explanation that Harold Deese found positive samples of medium petroleum distillate under the floor protector is that it may exist in the chemical makeup of the floor protector. (J. Posey depo., p. 71). Mr. Posey can provide no basis that meets *Daubert* for this assertion. In addition to the specific

problems of Mr. Posey's testimony, Plaintiff would offer that James and Eleanor Posey's attempt

to testify as bad faith experts are due to be excluded based upon the general problem that such

testimony does not meaningfully assist the jury.  Testimony about the duties of the claims handler

should not be admissible because of testimony by bad faith claim's expert on the issue of duty is one

for resolution of the Court and the expert testimony accordingly would not aid a properly instructed

jury.  Such testimony threatens not to "assist [but to] replace the fact finder" in the functions that are

exclusively observed for the jury, namely drawing common sense inferences from evidence and

deciding the ultimate issue (i.e. whether the insurer has acted in bad faith).  *First United FIN Corp.*

*v. United States Fidelity & Guaranty Company*, 96 F.3d 135, 136 (5th Cir. 1996); *United States v.*

*Scop*, 846 F.2d 135, 140 (2nd Cir. 1988) (District Court erred in admitting expert opinions that

Defendants had engaged in manipulation and fraud because those opinions were calculated to invade

the province of the Court to determine applicable law and to instruct the jury as to that law);

*Yannacopoulos v. General Dynamics Corp.*, 75 F.3d 1298, 1302 (8th Cir. 1996) (Expert testimony

that usurps jury's function to evaluate evidence and draw conclusions is  inadmissible).  Jurors are

capable of evaluating good and bad faith just as they regularly determine whether conduct was

reasonable or bring their own common sense and like experiences to bear.  *Thompson v. State Farm*

*Fire and Casualty Company*, 34 F.3d 932, 939 (10th Circuit 1994).  Jurors did not need an expert to

predigest the evidence and feed them a verdict.  See *Id*. at 941.  See also *Kooyman v. Farm Bureau*

*Mutual Ins.* Co., 315 N.W. 2d 30, 37 (I 11982); *American Mut. Ins. Co. of Boston v. Bittle*, 338 A.

2d 306, 310 (Md. Ct. Spec. App. 1975); *Hart-Anderson v. Hauck*, 748 P. 2d 937, 941-943 (Mont.

1988); *Kulak v. Nationwide Mut. Ins. Co.*, 351 N.E. 2d 735, 740 (N.Y. 1976).  A witness's testimony

that he or she discerns bad faith therefore fails to satisfy the "only true criteria" for admissibility --

whether the evidence will meaningfully assist the jury.  *7 John H. Wigmore, Evidence at Trials of Common Law 29* (*Chadbourne Ruv*. 1978).  See Fed. R. Evid. 702.  See also *Paley v. Federal Home Loan Mortgage Corporation*, 1994 WL 327659 (E.D. PA. July 7, 1994) (Court finds in a case dealing with a suit over whether a party to a sales contract for land exercised and/or breached a fiduciary duty and acted in bad faith that expert opinion on the issue of bad faith and breach of fiduciary duty is not necessary to assist the fact finder in that case and excluded such as proper expert testimony).

Further, both Eleanor and James Posey's testimony is subjective to their general method of reaching conclusions. An expert simply reviewing the documents of the insureds and drawing conclusions that these documents indicated bad faith is improper inference for the expert to make. *First United Financial Corp. v. United States Fidelity & Guaranty Company*, 96 F.3d 135 (5th Cir. 1996). Such an inference can be drawn by the jury if the documents show it.  An expert cannot also draw conclusions about the insurers' general claims handling practices based upon a self-selected sample of insureds claims files.

James Posey's testimony is indeed a stretch.  He admits he is not a lawyer and does not know bad faith law.  ( J Posey depo., p. 20).  He also provided unusual examples to back up his idea that there was an intent to deny the claim.  Such as speculation that the retention of a law firm during the investigation of a suspicious claim indicated an intent to deny the claim. Mr. Posey criticized Harold Deese for not taking comparison samples but when asked if he took comparisons, Mr. Posey stated no. Posey went so far as to claim that Cincinnati should have considered the possibility of an intruder hiding in the building when Mr. Cochran initially left.  This statement is bizarre because it completely ignores how Mr. Cochran testified that the fire started.  Although Posey goes on about

how Deese removed certain things from the fire scene he at the same time states that Deese's removal of things from the fire scene did not affect his conclusion.  Mr. Posey's conclusions and criticisms are generalized without any basis to support them.  It does not purport to show any standards that have specifically been violated or show how any potential issues materially affected the case. Mr. Posey  does not dispute that the accelerates were found all over the building or that Cincinnati had a debatable reason for denying the claim.

The same analysis applies to Posey's  testimony as a cause and origin expert.  Mr. Posey was hired after the fact, his conclusions dispute on-the-scene fire investigators, it contains generalizations and vague assertions without any analysis or specific basis to challenge.

## D.     Pyron Pounds and Jesse Sprayberry

Defendants intend to offer a polygraph test that was administered to Matthew Cochran by an individual named Pyron Pounds.  Mr. Pounds' testimony has not been recorded in deposition or otherwise and has since died.  Defendants therefore intend to authenticate his findings through another polygraph expert named Jesse Sprayberry.  Sprayberry's report submitted in the pretrial disclosure is attached as Exhibit "S" to this motion.  Plaintiff requests that this evidence not be admitted because it cannot be properly authenticated.  Polygraph exams involve subjective considerations.  Sprayberry cannot be used to authenticate the work of Pounds.  Further, it is well recognized that polygraph examination results are not admissible unless "both parties stipulate in advance as to the circumstances of the test and as to the scope of its admissibility" as subject to the evidence, or the evidence is offered only to impeach or corroborate the testimony of a witness.  *U.S. v. Piccinonna*, 885 F.2d 1529, 1536 (11th Cir. 1989).  The Plaintiff in this case has not made any stipulation regarding the admissibility of the polygraph evidence.  Defendants seek to have Exhibits

-32-

11, 165, 225, 782, 803, 854, 1018, and 1019 admitted into evidence for the purposes other than

corroboration or impeachment.   Additionally polygraph evidence similar to that of the issue in this

case is recognized as being intermissible for purposes corroboration under Rules 403, 608 in the

*Federal Rules of Evidence.   Maddox v. Cash Loans of Huntsville*, II, 21 F. Supp.2d 1336, 1338-1340

(N.D. Ala. 1998).   The *Daubert* standards stated above cannot be met by simply having another

alleged expert come in and rubber stamp these polygraph findings.

E.   **Don Mosley**

Defendants offer Mr. Don Mosley as an expert regarding the review of the audio cassette tape

recorded by Harold Deese.   Don Mosley completed high school but never received a college degree.

(Mosley Deposition, Exhibit "T", p. 6).   Mr. Mosley has no formal training in the area of audio

analysis, outside his work experience.   (Mosley depo., p. 8).   Mr. Mosley did obtain a "first class

engineer's license in broadcast engineering which related to the technical aspects of radio." (Mosley

depo., p. 9).   Mr. Mosley's background is in recording radio and television commercials and audio

(Mosley depo., p. 7), radio announcing (Mosley depo., p. 9), creation of jingles in the commercial

radio field (Mosley depo., p. 12),  operating a sound board (Mosley depo., p. 9) and repairing audio

equipment (Mosley depo., p. 9).   Mr. Mosley is not aware of any licenses that are required in the

field of audio analysis.   (Mosley depo., p. 7).

Mr. Mosley was a member of the Birmingham Advertising Club but does not hold a current

membership.   Mr. Mosley is not a member of any professional organizations or associations in the

field of audio analysis.   Mr. Mosley does not hold any licenses or professional certificates other than

a business license.   (Mosley depo., pp. 7 and 39).   Mr. Mosley has written no professional articles

relating to the field of audio analysis.   He did indicate that he has been asked to write articles but he

considered what he does as proprietary and not something he wants to tell the "rest of the world how to do." (Mosley depo., p. 22). Mosley testified that what he does is called "forensic audio" but he doesn't really know why it is called "forensic audio." (Mosley depo., p. 31).

When reviewing audio tapes and rendering an opinion in this matter, Mosley did not refer to any manuals or procedures. According to Mr. Mosley, there is a procedure he follows in investigating a tape but said procedure was not established by any governing body. (Mosley depo., pgs. 39 and 40). In reviewing the tape at issue, Mr. Mosley testified he used computer software by a company called Spectral which is no longer in business. The software used to analyze the tape is no longer functioning and Mosley does not know why the software program failed. The software program became inoperable a couple of months after Mosley reviewed the tape at issue in this matter. (Mosley depo., pp. 23 and 24).

Mr. Mosley's Curriculum Vitae states that he has been retained as an expert on over 150 occasions regarding audio enhancement, tape tampering, voice print analysis, and difficult transcripts. However, Mr. Mosley agreed at his deposition that the bulk of his services performed "on over 150 occasions" was primarily audio enhancement and tape copying. (Mosley depo., p. 30). Audio enhancement is simply enhancing speech from degraded audio so the speech can be heard. (Mosley depo., pp. 26 and 27). Mosley also testified that a majority of the 150 or more occasions did not require him to render a written opinion nor resulted in trial testimony. (Mosley depo., p. 30).

Mr. Mosley provided an affidavit on May 27, 2003, regarding his preliminary examination of an audio cassette tape marked Exhibit #27. Mosley testified the term "preliminary examination" means listening to the tape. (Mosley depo., pp. 46 and 47). The preliminary examination, the basis of Mosley's first affidavit, did not include any computer analysis. (Mosley depo., pp. 57 and 58).

-34-

The audio tape contained two interviews; specifically, one interview with Matthew Cochran and one with Peter Preston, respectively.  The affidavit notes two anomalies, or "holes" in the audio,  that occur during both interviews.  Mosley avers there are  two scenarios in which the anomalies could have occurred: (1) a defect in the manufacture of the tape (highly unlikely), or (2) someone utilizing two recorders and operating a pause button in an attempt to edit the tape.    Mosley also avers that he could render an opinion regarding the anomalies with further evaluation.  (May 27, 2003, Mosley Affidavit, Exhibit 6 to Mosley Deposition).  It is evident that Mosley's preliminary examination was simply listening to the tape and upon further evaluation he could determine if the holes were created by a defect in the tape or someone utilizing two recorders with a pause button.  Mosley provided a second affidavit on June 2, 2003, regarding his second examination of the tape at issue and his opinion of when erasures occur on the tape.  Mosley averred:

> I have located the record signatures of the machine that made the original recording and the machine that did the erasure.  They are the same.  To restate, the same recorder that recorded the original audio is the same recorder that did the erasure.

(June 2, 2003, Mosley Affidavit, Exhibit 6 to Mosley Deposition).  Mosley's opinion, stated above, contradicts his opinion articulated in his first affidavit.  The first affidavit sets forth two scenarios which could have caused the anomalies in the audio tape and upon further examination he could determine which scenario occurred.  The second affidavit states he further examined the tape and he found that the same recorder which recorded the original tape recorded the erasure.  This conclusion is a new scenario outside the two scenarios indicated in his first affidavit.

During his deposition, Mosley was asked to describe an anomaly.  Mosley testified an "anomaly is something outside the ordinary which might occur."  When Mosley was asked to

describe the anomaly which is referenced in his affidavit he testified :

> Well, I don't have anything to review to answer your question because I no longer have the data on that.  It was a cassette tape that was returned.  I can certainly testify to that if I could review the tape again, which I don't have.

(Mosley depo., p. 47).  Mosley was further asked to elaborate on what his affidavits refer to as "holes."  Mosley provided a general explanation of what a "hole" is but then testified that he would have to review the tape again to answer the question specifically related to the tape at issue.  (Mosley depo., p. 49).  Mosley further testified that he only looked for the initiation of the "record signature" a recording device leaves during a recording and did not review or examine for an end of record signature:

> Q.   But there is no end of record signature that you identified?
>
> A.   I did not look for one.
>
> Q.   Would there be one?
>
> A.   There could possibly be.

(Mosley depo., p. 80).

Mosley did not conduct a complete review of the tape at issue.   Mosley was asked by Defendants' counsel to evaluate the tape but was told by defense counsel that his client did not have a lot of money.  (Mosley depo., p. 43).  Mosley testified that he did not spend much time during his first examination of the tape his opinions of which are encompassed in his  first affidavit of May 27, 2003.  (Mosley depo., p. 57).  Mosley testified he concentrated on one place on the tape during the second interview because:

> A.   I really didn't because to me that was - - at that point was proof that the erasure had occurred, and whatever else was on the tape was - -

-36-

> at least to me was not necessarily of import.  And, again, we were
> operating on a rather  tight budget as such, and we could have looked
> at a lot of areas on the tape but it gets into a time consideration thing
> for which we end up charging.  And I did not look at the rest of the
> tape.

(Mosley depo., p. 68).   The only portion of the audio which Mosley reviewed further was of Pete

Preston's interview.  Pete Preston's interview is not a issue in this matter.  What is at issue is the

interview of Matthew Cochran on the tape which Mosley simply listened to in his preliminary

examination.  (Mosley depo., p. 50).  Mosley performed no further examination of the interview

recorded of Matthew Cochran.

The affidavits of Mr. Mosley fail to comply with *Fed.R.Civ.P.* Rule 26(a)(2)(B), which

requires the "reports must include 'how' and 'why' the expert reached a particular result, not merely

the expert's conclusory opinions."  *Salgado v. General Motors Corp.* 150 F.3d 735, 742 (7th Cir.

1998) (*citing Reed v. Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996).  Both affidavits of Mosley contain

only conclusory opinions.  The affidavits fail to set forth the method of examination, review or

analyses.  Mr. Mosley's first affidavit does not elaborate on the vague terminology  "preliminary

examination."  There is no identification of what tests and analyses were performed.  Mr. Mosley's

second affidavit indicating his further examination of the tape does not indicate what tests, analyses

or computer software was utilized in drawing his conclusory opinions stated.  It was not until the

deposition of Mr. Mosley that Plaintiff was able to determine exactly how Mr. Mosley reached his

conclusions.

Mr. Mosley's affidavits and his deposition demonstrate that his testimony in this case violates

the *Daubert* requirements of qualification, relevance and reliability for expert testimony.  His

affidavits and  testimony are due to be excluded under Rule 702 of the *Federal Rules of Evidence*

-37-

and the *Daubert* line of cases.  The proposed testimony of an expert must arrive from scientific method; good grounds and appropriate validation must support it.  *Daubert* 509 U.S. at 590.

The reliability of the opinions offered by Mr. Mosley squarely come into question due to the fact that defense counsel put him on a tight budget in his examination and evaluation of the tape and Mosley did not conduct a complete review of the tape but concentrated his examination on one area of the tape.  The reliability of Mr. Mosley's examination of the tape is further suspect when the software he used to examine the tape is no longer operable, the software failed a couple of months after Mosley's examination of the tape and the manufacturer of the software is out of business.  The reliability of Mr. Mosley's opinions are also questionable when he could not answer questions during his deposition regarding the specific anomalies or holes which he initially identified because he did not have the data.  Mr. Mosley testified that he could answer those questions if he was able to examine the tape again.   There is a validation problem in this matter because Mosley did not have the data needed to give testimony regarding the anomalies identified.  Mosley clearly stated that for him to provide testimony he would have to review the tape again.  Further the procedure followed by Mosley in examining the tape at issue was not established by any governing body of audio analysis or scientific testing. The reliability of Mr. Mosley's conclusory conclusions are suspect when they contradict one another.  The first affidavit which was rendered by simply listening to the tape sets forth two scenarios to explain the erasure that occurred on the tape.  The second affidavit again containing conclusory conclusions provided a source of the erasure outside the two scenarios provided in the first affidavit.  Lastly, the further examination of the tape was centered around the interview with Pete Preston which is not at issue.  Mosley failed to conduct any further review of the interview of Matthew Cochran because of budget constraints.  Any testimony provided by Mosley

would only confuse the jury and would wholly fail to aide the jury in resolving a factual issue as explained in *Daubert*.

**F.    Daniel L. Koch**

On November 23, 2004, Dr. Daniel L. Koch ("Koch") drafted a Neuropsychological Evaluation of Matthew Leath Cochran ("Cochran"). (Exhibit "U", Koch's evaluation of Cochran). Cochran's attorney, Steven Tunstall ("Tunstall"), was present when said evaluation took place. The evaluation took place approximately six days before the pre-trial expert disclosures cutoff date, scheduled for November 29, 2004.

The purpose of the evaluation was to assess the psychological state of Cochran as related to the fire that took place at Foreign Auto Parts. The evaluation begins with the immediate history of the events leading to the discovery of the fire. Subsequently, the evaluation describes Cochran's arrival at Foreign Auto, discovery of the fire, and a resulting feeling of disorientation as he exited the building.

Next, Koch's evaluation describes Cochran's confrontation with a passing motorist, as well as entering Pete Preston's (Preston) vehicle. The evaluation states Cochran was unable to remember what was said to Preston. The report then notes that a Police car pulled up to Preston's vehicle. Cochran apparently told Koch that, "we went to a pay phone to call the fire department and a minister had already called the fire department."

Koch's evaluation concludes his factual account by stating Cochran is still confused about the events that evening, and that Cochran claims to have only had one beer on the night of the fire. Koch's analytical evaluation begins by stating it is traumatic being "in" a fire, and that trauma typically creates the suspension of critical thinking. In addition, Koch believes six years is a long

time for these issues to be unresolved. Dr. Koch points out that he has no special insight into what happened the night the fire occurred. Dr. Koch further notes that, based on the MMPI - 2 and the Millon - II, tests administered on November 22, 2004 that measure personality traits, Cochran does not suffer any mental disabilities. Dr. Koch also administered an initial MMPI - 2 in July of 1999, approximately five (5) years before the above mentioned personality tests. Dr. Koch has evaluated and/ or treated Cochran on only two occasions.

Koch's continues with an evaluation of Cochran's financial status. Cochran represents to Koch that his business has been financially successful, and with a "grand opening' and significant investment in [Foreign Auto], including new equipment, everything "boded for a brighter future". Based on said subjective interpretation of Cochran's financial status, Koch concludes his evaluation by stating he sees no motive for Cochran to burn down his business.  The standard applied in Federal Court regarding the admission of expert  testimony has been set forth in Rule 702 of the *Federal Rules of Evidence*.  Rule 702 states, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." F.R.C.P. Rule 702.

The *Daubert* Court expanded on the language of Rule 702: Faced with the proffer of expert scientific testimony, trial judge must determine at the outset whether to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine fact in issue; preliminary assessment must be made of whether that reasoning or methodology properly can be applied to the

facts in issue." *Id.* "In determining whether theory or technique is scientific knowledge that will assist trier of fact, and, thus, whether expert testimony is admissible, is whether theory or technique has been subjected to peer review and publication." *Id.* "In determining admissibility of expert opinion regarding particular scientific technique, court ordinarily should consider known or potential rate of error, and existence and maintenance of standards controlling technique's operation." *Id.* "Overarching subject of Federal Rule of Evidence on admission of scientific testimony and evidence is scientific validity, and, thus, evidentiary relevance and reliability, of principles that underlie proposed submission." *Id.*

The tests for admissibility is two prong: relevance and reliability. Relevance looks to whether the evidence can assist the trier of fact in the context of the issues and the evidence in the case. Reliability is concerned not with the ultimate correctness of the proffered testimony, but rather in reaching the opinion or conclusion that expresses the expert's use of sound scientific methodology.

In the present case, Koch's analysis and conclusion simply do not meet the standards set forth in either Rule 702 or *Daubert.* Essentially, Koch's evaluation is based on mere conjecture and speculation. In fact, the evaluation is in no part relevant to the issues of the case at bar. Essentially, Dr. Koch is providing an analysis of Cochran's state of mind at the time of the fire. However, Cochran's state of mind is simply not at issue in the instant case. There has been no evidence presented in this lawsuit that relates to whether or not Cochran was in a particular "state of mind" at the time Foreign Auto was destroyed by fire. As such, Koch's evaluation provides no reasonable use to assist the trier of fact as to whether Cochran was in the right "state of mind" to set fire to the structure.

Moreover, there is a complete lack of reliability regarding the manner in which Koch reached his conclusions. First, Koch bases his evaluation wholly on subjective representations made by Cochran. For example, he completely relies upon Cochran's description of, "feeling disoriented when he left the building in alarm." In addition, Dr. Koch states that, "It is certainly traumatic to find oneself in a fire. Trauma typically creates the suspension of critical thinking." Koch provides no scientific evidence to bolster the credibility of these statements. In fact, the only tests provided by Mr. Koch are two personality tests, the MMPI - 2 and the Millon II. These tests in no way show whether or not trauma creates the suspension of critical thinking. They are simply a subjective evaluation of Cochran's personality.

In addition, Koch evaluation is, in part, based on Cochran's subjective representations of his financial status. The report states, "the patient represents being successful financially in business and planning a grand opening of his business with considerable investment and additional equipment, which boded for a brighter future".

Koch has determined Cochran is incapable of setting fire to Foreign Auto based on literally this solitary statement, coupled with Cochran's representation of the events as they unfolded on November 11, 1998. This is a frivolous evaluation. Koch's report is based solely on the subjective representations of Cochran. Koch has not reviewed any documentation, reports, or records regarding Cochran's financial status. However, Cincinnati would not expect Koch to review said documents, as Koch is not an expert regarding financial matters. It is, at best, specious to simply take the party's representation as truth that he or she is financially solvent, much less successful. As such, the reliability of Koch's evaluation must be called into question.

-42-

In addition, Koch's report is based on very limited research and information. The report states, "I asked Mr. Cochran why he is here and he states that there are still legal issues relating to the conditions regarding the fire at his place of business back in 1998. I asked the patient to refresh me on matters related to that, as it has been some time even though I have reviewed the 1999 record." Koch has seen Cochran only twice within a five year span. In the these two visits, Koch was able to determine that Cochran was unable to set fire to Foreign Auto simply based on Cochran's subjective representations. This evaluation is completely void of reliability, as no scientific technique was relied upon or subjected to peer review and publication in reaching this conclusion.

Moreover, this evaluation lacks credibility and reliability. The report states, "Mr. Cochran is seen this date in the company of his attorney of Steven Tunstall, Esq." Mr. Tunstall's presence places the legitimacy of the evaluation into question, because Mr. Tunstall is not present in an objective capacity. Mr. Tunstall is an advocate for Cochran, and thus would promote any evaluations that intend to prove Mr. Cochran did not set the fire. The evaluation was not taken in an objective and neutral setting, and is thus flawed. In addition, Mr. Cochran's timing, over 5 years since his last appointment and only six days before the expert disclosures cutoff date, gives rise to the suspicious nature of Dr. Koch's evaluation. At best, it appears convenient Dr. Koch would provide such compelling testimony that Cochran had no motive to destroy his business.

Finally, Koch's has provided the parties with a list of depositions and court appearances he has participated in over the span of his professional career. However, it is important to note that in over one-hundred and fifty appearances, not one have been related to an arson investigation. As such, Koch has no experience in these types of cases.

The evaluation of Koch simply does not meet the standard under Rule 702 of the *Federal Rules of Evidence*. First, the testimony will be based on limited information and data, second, the testimony is the product of Cochran's subjective interpretation of his financial status and the events of November 11, 1998. Finally, Koch has simply applied his personal belief that Cochran was not capable of setting the fire. As such, Koch's evaluation should be deemed inadmissible should Cochran attempt to introduce the expert testimony of Dr. Koch. Any testimony provided by Dr. Koch would only confuse the jury and would wholly fail to aide the jury in resolving any factual issue as explained in *Daubert*.

**G.     Lewis K. Pannell**

Defendants offer Lewis K. Pannell to rebut the fire debris analysis performed by Mary Rhodes Holt, Forensic Scientist for the State of Alabama Department of Forensic Sciences and Forensic Scientist, Laurel Waters.

Dr. Pannell majored in chemistry and received his PhD in chemistry. (Pannell Deposition, Exhibit "V", p. 8) From 1975 to 1984 while in his home country of New Zealand, Dr. Pannell was employed by the Department of Scientific and Industrial Research. His role was part of the forensic institution that did work for police, customs and the health department. He testified his work included arson work but then testified he did not do the arson work directly. Most of his work was associated with drug analysis. (Pannell depo., p. 16).   Dr. Pannell did testify that he worked alongside an arson investigator and would run samples. Dr. Pannell testified he probably ran less than 50 samples because in those days mass spectrometry was a very specialized instrument and not routinely used in such analysis - meaning fire debris analysis. (Pannell depo., pp. 20, 22).   While supervising the toxicology lab, Pannell mainly ran drug-related analysis. (Pannell depo., pp. 23- 24).

Dr. Pannell's last memory of analyzing fire debris samples was during his employment in New Zealand during 1975 to 1984.  However, the separation technique used during 1975 and 1984 is different from the technique used today.  During his employment in New Zealand, normally a solvent-type extraction was used instead of the carbon traps utilized today.  (Pannell depo., p. 29)  Dr. Pannell's only experience in the specific field of fire debris analysis occurred  some thirty years ago using a different technique than used today.

In 1983 when he came to the United States and worked alongside Dr. Henry Fales, Dr. Pannell interpreted spectra but he does not remember if he was ever called on to interpret data related to fire debris analysis.  (Pannell depo., pp. 25-26).  During his employment with the National Institute of Health, Dr. Pannell does not remember being called upon to do any type of fire debris analysis.  (Pannell depo., p. 26).    Dr. Pannell has developed methods to improve access to information using mass spectrometry relating to medical issues; however, Dr. Pannell's research and development did not deal with fire debris analysis.  (Pannell depo., p.. 33-34).

Currently, Dr. Pannell is a professor in the Cancer Research Institute at the University of South Alabama.  (Pannell depo., p. 8)   In his position as professor, he uses mass spectrometry to analyze small molecules to very large molecules. (Pannell depo., p. 10).  His work at the Cancer Research Institute is specialized in the field of medical and health issues and ventures into other areas very little.  (Pannell depo., pp. 10-11).  During his employment with the University of South Alabama, Dr. Pannell's analyses never included fire debris analysis.  (Pannell depo., p. 27).

Dr. Pannell has not testified as an expert by deposition or in a court of law in the last four years.  (Pannell depo., p.30).    His testimony in federal court in Australia in 1984 was a drug  case and not related to fire debris analysis. In 2003, Dr. Pannell was asked to review gas chromatography

and mass spectrometry analysis of drugs in a lawsuit but his expert opinion was not related to fire debris analysis. (Pannell depo., p. 31). Of the professional associations and organizations which Dr. Pannell is a member, none a related to fire debris analysis. None of the professional organizations which he is a member provides training and education in the analysis of evidence from a fire scene or training and education in the investigation of the cause and origin of fires. (Pannell depo., pp. 36-39). Pannell's Curriculum Vitae cites over 150 publications which he has authored. Pannell testified that "[p]robably the majority of those articles are more medically related." When asked if any of the articles he has authored related to fire debris analysis Dr. Pannell testified no. (Pannell depo., pp. 19-20). Dr. Pannell has taught various classes; however, none of the classes were related to fire debris analysis. (Pannell depo., p. 27).

There is no dispute that Dr. Pannell has the education and experience in the field of gas chromatography (hereinafter "GC" and mass spectrometry (hereinafter "MS"). However, Dr. Pannell's career has greatly, if not completely, been centered around GC/MS relating to medical and health issues. A cursory review of his employment history contained on his Curriculum Vitae confirms his specialization of GC/MS in the medical field, i.e., Cancer Research Institute, National Institute of Diabetes and Digestive and Kidney Disease, United States University of Health Sciences and National Heart and Lung Institute with the National Institute for Health. Any experience obtained by Dr. Pannell relating to fire debris analysis occurred thirty years ago in New Zealand wherein a different separation technique was used and mass spectrometry was a very specialized instrument and not routinely used in such analysis. Dr. Pannell was asked a series of questions regarding what one would expect to see from fire debris analysis and he testified he did not know because he had never conducted such analysis:

Q. What compounds would you expect to see from an extract of an athletic shoe that does not contain a foreign ignitable liquid?

A. I don't know. I haven't done it.

Q. What are some of the components that you would expect to see in an extract of a sample of burned linoleum that does not contain an ignitable liquid?

A. I've not done it.

Q. Okay. What are some of the components you would expect to see in an extract of a sample of unburned linoleum that does not contain an ignitable liquid?

A. I have not done it.

Q. What are some of the components you would expect to see in an extract of a sample of burned carpet and padding that does not contain an ignitable liquid?

A. I have not done it.

* * * *

Q. What are some of the components you would expect to see in extracts of samples of unburned clothes, cloth material that does not contain ignitable liquid?

A. I have not done it.

Q. What are some of the components you would expect to see in extracts of samples of burned cloth materials that do not contain an ignitable liquid?

A. I've not done it.

(Pannell depo., pp. 60, 61, 63 and 64). When Dr. Pannell was asked the significance of including

in his report that there is siloxane background in sample three containing the blue pants he testified:

A. Probably nothing because it's in the background, the contamination and its work-up procedure.

Q. And is there any particular reason why you chose to mention that if it doesn't have any significance?

-47-

A.      No.  I'm summarizing everything I see in the spectra.

(Pannell depo., p. 63).  Finally, when asked what are some of the compounds that are recovered from debris samples that are not common to the ignitable liquid classification as described in E1618, Dr. Pannell testified "I told you I have not done that work."  (Pannell depo., pp. 90-91).  Further, Dr. Pannell was questioned about a portion of his report regarding the lack of identification of the largest peak in carpet sample seven:

Q.      Okay. So what is the significance of identifying that largest peak?

A.      I believe that peak was actually in the background.  It was in the non-background subtracted spectra.

Q.      So, there again, you're just making notes of everything that you see regarding that?

A.      That's what I looked at, all the spectra.

Q.      How does knowledge of the identity of that largest peak relate to fire debris analysis?

A.      It probably has no relation because it's in the background.

(Pannell depo., pp. 67-68).  It is apparent that Dr. Pannell's report includes information which has no significance at all to fire debris analysis but was included just because he saw it in the spectra or data.   Information which has no significance to the fire debris analysis conducted by the Alabama Department of Forensic Science and Laurel Waters has no relevance and will only confuse the jury as to the true issues.  Further, Dr. Pannell criticizes Laurel Waters' fire debris analysis regarding aspects which are not required in the regulations:

Q.      When you have a fire debris sample and you are analyzing the data from a mass spectra or the process, are you not going to find other components in that sample?

A.      Unfortunately the analyst here did not look at the mass spectra.  She looked at the reconstructed or total ion chromatograms.  It's two names for the same thing.

-48-

Q.    Okay.

A.    She did not appear to look at the spectra as stated, I believe, in her depositions.  She didn't do anything that was not provided in her package.

Q.    Is it your opinion that in the area of fire debris analysis that the entire spectra must be reviewed to render an opinion?

A.    No.  That's not what's required in the regulations.

(Pannell depo., pp. 71-72).  In another effort to discredit the fire debris analysis of Waters, Dr. Pannell calls into question the presence of alkanes in a sample; however, the end result still leads to the presence of a distillate:

Q.    What importance is the fact that other components are present in determining whether or not there is a presence of a medium petroleum distillate?

A.    Because the analyst only in this case said there is a medium petroleum distillate. They ignored other things.  There are other alkane fractions that extend higher than that.  For instance, kerosenes are listed to start at C8 right where the medium petroleum distillates move up to C17.  That would be much more consistent possibly. But there's no reference spectra provided, and I can only base on what is provided.

Q.    And what is kerosene?  How is that - - is it a - -

A.    It's a distillate.

(Pannell depo., pp. 82-83).  Said criticisms are irrelevant and immaterial to any issue in this matter and specifically have no relevance of the reliability of the fire debris analysis performed by Laurel Waters.


       /s/ William F. Patty       
**MICHAEL B. BEERS [BEERM4992]**
**WILLIAM F. PATTY [PATTW4197]**
**ANGELA C. TAYLOR [TAYLA2713]**
Attorneys for Cincinnati Insurance Company

-49-

**Of Counsel:**

BEERS, ANDERSON, JACKSON,
  PATTY & VAN HEEST, P.C.
Post Office Box 1988
Montgomery, Alabama  36102-1988
(334) 834-5311
(334) 834-5362 fax

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 5, 2005, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to the following:

Stephen M. Tunstall, Esq.
Post Office Box 152
Mobile, Alabama 36602

James B. Newman, Esq.
HELMSING, LEACH, HERLONG,
NEWMAN & ROUSE, P.C.
Post Office Box 2767
Mobile, AL 36652

Melissa A. Posey, Esq.
4275 Rommitch Lane
Pensacola, Florida 32504

on this the 5th day of May,  2005.

s/William F. Patty
Of Counsel for Cincinnati Insurance Company