**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| THE CINCINNATI INSURANCE COMPANY | ) ) |
| | ) |
| PLAINTIFF, | ) ) |
| | ) |
| V. | ) |
| | ) |
| MATTHEW LEATH COCHRAN, ET AL., | ) |
| | ) |
| DEFENDANTS. | ) |

CASE NO.:  CV-99-0552-WS-C

## DEFENDANTS' RESPONSE TO CINCINNATI INSURANCE'S MOTION IN LIMINE REGARDING DEFENDANTS' EXPERTS

**COMES NOW** Defendants Matthew Leath Cochran, Foreign Auto Parts of

Mobile, Inc., and Professional Engine Service of Mobile (hereinafter "Mr. Cochran"), in

the above referenced matter by and through undersigned counsel and hereby objects to

and responds to Plaintiff's (hereinafter "Cincinnati Insurance") Motion in Limine

regarding Mr. Cochran's Experts and would show as follows:

I.    ELEANOR P. POSEY, P.E.

Qualifications –

1. Cincinnati Insurance has challenged the qualification of Eleanor Posey, which

Mr. Cochran believes is a waste of the Court's time.  As a result, Mr. Cochran feels

compelled to respond.

2. After graduating from engineering school in 1974, Eleanor Posey became

involved in the practice of forensic engineering and has continued for twenty-nine years.

Eleanor Posey is a Registered Professional Engineer in Alabama (P.E. Registration #

13670), which requires specific education, work experience and written examination on

1

the principals and practice of engineering.  Mrs. Posey is also Board Certified Diplomate in Forensic Engineering (Certificate # 513).  In 1996 the American Academy of Forensic Sciences - Engineering Sciences Section, awarded Ms. Posey its Andrew H. Payne, Jr., Special Achievement Award due to her advancement of forensic engineering sciences. Ms. Posey is a Senior Member of the National Academy of Forensic Engineers. (See Court Doc. 301-2, Exhibit A – Part 1, Page 7 – 9 of 9)

3.  Eleanor Posey is a Certified Fire and Explosion Investigator under the National Association of Fire Investigators (Certificate # 3772-774).  Ms. Posey is a Certified Fire Investigation Instructor under the National Association of Fire Investigators (Certificate # 3772-774).  Ms. Posey has been a member of the National Fire Protection Association's Technical Committee For Investigation Of Fires Of Electrical Origin, which wrote the Manual On The Investigation Of Fires Of Electrical Origin, NFPA 907 M.  This Manual was revised several times and ultimately incorporated into the NFPA 921 Guide For Fire and Explosion Investigation. (See Court Doc. 301-2, Exhibit A – Part 1, Page 8 of 9; Exhibit A – Part 2, Page 2 of 9).  Long considered the guide and standard for fire and explosion investigation.

4.  The State Fire Marshall has previously appointed Ms. Posey to the Alabama Firefighter Personnel Standards and Education Commission's First Committee For The Development Of Standards For Fire Service Inspectors, Investigators, And Public Fire Prevention Education Officers.  Eleanor Posey was the Chair for the University of Alabama at Birmingham's Advisory Committee For The Development Of Fire And Arson Investigation Programs.  Ms. Posey was a member of the Alabama State Fire College's Planning Committee For The Basic And Advanced Fire and Arson Investigation

2

Conference. Eleanor Posey is a Member of the Technical Editorial Advisory Committee for the publication "The Fire and Arson Report". (See Court Doc. 301-3, Exhibit A – Part 2, Page 2 of 9).

5. Ms. Posey is an Associate Staff Member of the Pipeline Safety Training Committee for the United States Department of Transportation's Transportation Safety Institute. (See Court Doc. 301-3, Exhibit A – Part 2, Page 2 of 9).

6. The United States Fire Administration's National Fire Academy employed Eleanor Posey to serve on their Curriculum Advisory Committee for current and future fire and arson investigation related courses given by the National Fire Academy. (See Court Doc. 301-3, Exhibit A – Part 2, Page 4 of 9).

7. As a Member of the American Society For Testing and Material - (ASTM) Eleanor Posey has been involved in the very writing and reviewing of Codes or Standards for Forensic Sciences and Forensic Engineering. (See Court Doc. 301-3, Exhibit A – Part 2, Page 4 of 9).

8. In 1985 United States Secretary of Transportation Elizabeth Dole appointed Eleanor Posey to a three- (3) year term on the Technical Pipeline Safety Standards Committee. Subsequently, United States Secretary of Transportation Burnley re-appointed Ms. Posey to a second term. (See Court Doc. 301-3, Exhibit A – Part 2, Page 2 of 9).

9. In an ironic twist, some of the very organizations Cincinnati Insurance would have this Court believe should have employed Ms. Posey in order for her to be qualified, actually came to her for her expertise and advise regarding the selection, education and qualifications for forensic engineers and fire investigators. Apparently,

3

Cincinnati Insurance believes its self-serving opinion regarding Eleanor Posey is somehow more relevant than the State Fire Marshall, Law Enforcement, National and State Boards, National and State Colleges and Governing Bodies who deal directly with forensic engineering and fire investigation issues on regular basis.

10. As Cincinnati Insurance well knows, in her twenty-nine (29) years as an expert in the field of electrical engineering / forensic engineering and fire investigation / fire origin and cause, Eleanor Posey has never been disallowed as an expert witness in Electrical Engineering / Forensic Engineering and Fire Investigation / Fire Origin and Cause. Ms. Posey's testimony or opinions as an expert witness have never been excluded.

11. In fact, Ms. Posey has acted as an expert in other significant cases involving Cincinnati Insurance. (See *Cincinnati Insurance Company v. Synergy Gas, Inc.*, 585 So.2d 822 (Ala.1991). Furthermore, as Cincinnati Insurance and its attorney's knew when they filed this motion alleging Ms. Posey was not qualified, the Alabama Association of Arson Investigators (AAAI) certified Eleanor Posey as a Fire Investigator in 1986. The legal counsel for the AAAI is Cincinnati Insurance's attorney Michael B. Beers; the Secretary of the AAAI is Cincinnati Insurance's Attorney Angela Taylor-Michael Beers partner; and, the President of the AAAI is Attorney Judy Van Heest – Michael Beers other partner. (See Court Doc. 150 / Paragraphs 13 &14 with attached exhibits).

12. At various times, Ms. Posey has been a Member of the International Association of Arson Investigators, including the Training and Education Committee, Forensic Research & Development Committee, as well as the Forensic Sciences and

4

Engineering Committee; the Alabama Association of Arson Investigators; National Fire

Protection Association; National Association of Corrosion Engineers; American

Consulting Engineers Council; Southern Building Code Congress International;

American Academy of Forensic Sciences, which included Engineering Sciences Section

and sub-committee Chairman or preliminary work on Joint Workshop on Fire Science;

International Association of Electrical Inspectors; National Association of Fire

Investigators, including being elected to the Board of Directors; National Society of

Professional Engineers; American Society of Safety Engineers; and National Safety

Council; Institute of Electrical and Electronic Engineers. (See Court Doc. 301-3, Exhibit

A – Part 2, Page 5 - 7 of 9).

    13. Ms. Posey is a Senior Member and Diplomate of the National Academy of

Forensic Engineers, including serving on the NAFE Committee on Forensic Fire

Investigation. (See Court Doc. 301-3, Exhibit A – Part 2, Page 7 of 9).

    14. Eleanor Posey has lectured or taught at the following:

ALABAMA STATE FIRE COLLEGE,

FIRE DEPARTMENT OFFICER'S SCHOOL
Electrical Safety For Firefighters
Electrical Fires - Basic Fire and Arson Investigation Conference
Electrical Fires – Advanced Fire & Arson Investigation Conference
Fire Cause Recognition – Electrical
Interviewing Exercise – Advanced Fire & Arson Investigation Conference

GEORGIA FIRE ACADEMY

Electrical Fires – Arson Investigation Conference

UNIVERSITY OF ALABAMA AT BIRMINGHAM

5

Electrical Fire Investigation Workshop
Gas Fire & Explosion Investigation and Prevention
Fire Investigation & Prevention Workshop on Pre-fabricated Fireplaces and Wood-
     burning Heaters
Courthouse Record Search Fire & Arson Photography
Southeastern Electrical Fire Investigation Conference
Electrical Fire Evidence Interpretation, Bomb & Arson Course – Dept. of Criminal
Justice
Gas Accident Investigation


GEORGIA ASSOCIATION OF ARSON INVESTIGATORS

Electrical Fires – Atlanta Section Seminar


GEORGIA STATE FIRE MARSHALL'S 18TH ANNUAL SOUTHEASTERN ARSON
SEMINAR

Electrical Fires


ELECTRICAL FIRE SCHOOL – FIRE TRAINING ACADEMY OF JEFFERSON PARISH

Electrical Fires


ARMY FIRE CHIEFS, 6TH WORLDWIDE TRAINING SESSION

Electrical Fires


UNITED STATES NAVY FIRE PROTECTION ASSOCIATION

Electrical Fire Investigation


ILLINOIS ASSOCIATION OF ARSON INVESTIGATORS 12TH ANNUAL FIRE &
ARSON CONFERENCE

Electrical Fire Workshop

AMERICAN ACADEMY OF FORENSIC SCIENCES, ANNUAL MEETINGS

Fire Investigation – Recognition of Damage to Electrical Conductors & Devices During a Fire, Due To Alloying
Fire Investigation – Calcination of Gypsum Wallboard and Fire Investigation
Fire Investigation – Arson or Accident?
The Electrical Arcing Fire – Was it a Ground Fault or a Phase-to-Phase Fault, Initially?
The Combustion of Aluminum in Electrical Arcing Fault Fires
A Tale of Two Busway Failures
Jack London's Wolf House Fire
Electrica Reliquiae Superannuata Sparks LUPINA MENAGE Catechization – or – Can Seemingly Useless Electrical Relics Illuminate the Cause of the WOLF HOUSE Fire

ALABAMA ASSOCIATION OF PLUMBING, GAS, AND MECHANICAL INSPECTORS
24th ANNUAL CONFERENCE AND SCHOOL OF INSTRUCTION
ENGINEERING EXTENSION SERVICE

Accident Investigation

UNIVERSITY OF WISCONSIN
DEPARTMENT OF ENGINEERING & PROFESSIONAL DEVELOPMENT

Electrical Fire Investigation
Electrical Fires - Some Special Considerations
Gas Fires – A Discussion of Fires and Explosions Involving Both Natural and LP Gas
Anatomy of a Fire

SOCIETY OF FORENSIC ENGINEERS AND SCIENTISTS

Multi-Disciplinary Nature of Fire Investigation

INTERNATIONAL ASSOCIATION OF ARSON INVESTIGATORS
38TH ANNUAL SEMINAR

Documenting the Fire Scene
Electrical Fires

FLORIDA ADVISORY COMMITTEE ON ARSON PREVENTION

Technical Thoroughness in Fire & Arson Investigation

NATIONAL ASSOCIATION OF CORROSION ENGINEERS

Corrosion in Forensic Investigations

UNITED STATES DEPARTMENT OF TRANSPORTATION
TRANSPORTATION SAFETY INSTITUTE

Pipeline Failure Investigation Techniques
Pipeline Safety Seminar

UNIVERSITY OF SOUTHERN MISSISSIPPI
FIRE-EXPLOSION-ARSON SEMINAR

Fire-Explosion-Arson Investigation Seminar
Electricity as Fire Origin & Cause Consideration
The Electrical Connection
Assisted in the set up and conduction of full-scale, instrumented, structure, burn tests,
    including a pure oxygen, accelerated fire
Properties of Combustible & Flammable Materials

SOCIETY OF FIRE PROTECTION ENGINEERS

Forensic Fire Investigation

UNIVERSITY OF ALABAMA
19TH ANNUAL SOUTHEAST, NATURAL GAS DISTRIBUTION SHORT COURSE

Accident Investigation in View of Today's Litigation Climate
Accident Investigation

ALABAMA NATURAL GAS ASSOCIATION CONFERENCE

Carbon Monoxide Poisoning & The Natural Gas Industry

JEFFERSON PARISH BOMB SQUAD & FIRE SERVICE

Post Blast & Arson Investigation Seminar – Assisted in set up and conduction of full-scale instrumented comparison tests of explosions involving natural gas, flammable liquid vapors, and high explosives, in an apartment building.

PENNSYLVANIA ASSOC OF ARSON INVESTIGATORS 13TH ANNUAL SEMINAR

Gas Explosions & Electrical Fires

INTERNATIONAL ASSOCIATION OF ELECTRICAL INSPECTORS

Electrical Fires & Accidents – Do National Electrical Code Requirements Matter

Eleanor Posey has authored or co-authored the following articles or reports:

NFPA No. 907M, Manual on the Investigation of Fires of Electrical Origin

"National Fire & Arson Report"
Calcination of Gypsum Wallboard Reveals Burn Patterns

"The Fire & Arson Investigator"
Outline for Fire Scene Documentation

Co-Authored Recent Advances in Auger Analysis of Electrical Arc Residues –
Presented at the International Association of Forensic Sciences, 13th Annual Meeting

Co-Authored The Electrical Arcing Fire – Was it a Ground Fault or a Phase-to-Phase Fault, Initially?

Co-Authored The Combustion of Aluminum in Electrical Arcing Fault Fires

Co-Authored A Tale of Two Busway Failures

Co-Authored Jack London's Wolf House Fire

Co-Authored Electrica Reliquiae Superannuata Sparks LUPINA MENAGE
Catechization –or- Can Seemingly Useless Electrical Relics Illuminate the Cause of the
WOLF HOUSE Fire?

Co-Authored The Appropriate Selection and Use of CO monitoring Instruments in
Forensic Investigations of Carbon Monoxide Asphyxiation Incidents.

(See Court Doc. 301-3, Exhibit A – Part 2, Page 8-9 of 9; Exhibit A – 3, Page 2-6 of 9).

15. Eleanor Posey has coordinated, supervised, set up or conducted the

following tests:

Eleanor Posey has coordinated and supervised Full-Scale Instrumented Burn Tests in

conjunction with the Pelham, Alabama Fire Department. This included coordinating and

supervising eight- (8) instrumented burn tests involving two structures using both natural

gas and electrical fire cause scenarios. (See Court Doc. 301- 4, Exhibit A – Part 3,

Page 3 of 9).

16. Ms. Posey set up and conducted two full-scale automobile burn tests during

the Advanced Fire & Arson Investigation Conference at the Alabama State Fire College

in Tuscaloosa, Alabama. (See Court Doc. 301- 4, Exhibit A – Part 3, Page 2 of 9).

17. Ms. Posey assisted in set up and conduction of full-scale, instrumented,

structure, burn tests, including a pure oxygen, accelerated fire during the Fire-

Explosion-Arson Seminar at the University of Southern Mississippi in Long Beach

Mississippi. (See Court Doc. 301- 4, Exhibit A – Part 3, Page 4 of 9).

17. Ms. Posey assisted in the set up and conduction of full-scale instrumented

comparison tests of explosions involving natural gas, flammable liquid vapors, and high

10

explosives in an apartment building during the Post Blast & Arson Investigation Seminar sponsored by the Jefferson Parish Bomb Squad & Fire Service in Jefferson Parish, New Orleans, Louisiana. (See Court Doc. 301- 4, Exhibit A – Part 3, Page 5 of 9).

18. Eleanor Posey has testified in Washington, D. C. before the United States House of Representatives, Public Works Committee regarding The Role and Value of the Technical Pipeline Safety Standards Committee Both Past and Future. (See Court Doc. 301 - 4, Exhibit A – Part 3, Page 5 of 9).

19. Moreover, in addition to all of the foregoing, Eleanor Posey has completed nearly 1800 post graduation class hours of continuing education study specifically related to fire, explosion, etc. and the cause / investigation of them. (See Court Doc. 301-1, Exhibit A -Part 3, Exhibit A – Part 4, Exhibit A – Part 5).

20. None of the vast foregoing education, testing, training, certification and experience prevented Cincinnati Insurance from representing to this Court the absurd contention that Eleanor Posey is not qualified as an expert witness in the area of Forensic Engineering / Electrical Engineering and Fire Investigation / Fire Origin and Cause. Eleanor Posey is a nationally recognized consultant regarding accidents and failures involving fire and explosions, particularly as it relates to electrical, gas and chemical with twenty-nine (29) years experience. Apparently Cincinnati Insurance contends that if you become a nationally renowned expert that consults with government entities and corporate interests on thousand occasions regarding various accidents and failures involving fire and explosions, and are asked to testify only on approximately 100 of those occasions as a result of that consultation work, that somehow makes you a "professional witness" who is not qualified as an expert.

11

21. Cincinnati Insurance criticizes Ms. Posey for such things as not having been a fire fighter or other government worker, when in fact Ms. Posey has been involved in the actual education, training and curriculum of fire fighters and other governmental personnel regarding the investigation of fires and explosions. Ms. Posey has twenty-nine (29) years of experience regarding evaluating electrical apparatuses, including as they relate to electrical safety; evaluating electrical failures that have resulted in fires, electrocutions, etc.; investigating fires and investigating explosions; and teaching others the same. Ms. Posey is a certified fire and explosion investigator and Ms. Posey is a certified fire investigation instructor.

22. Cincinnati Insurance has utilized such cases as *Pires v. Honda Motor Company*, 31 F.3d 543, 546 (7th Cir.1994), with quotes regarding it being 'comforting to see experts with analysis derived independently rather than parroting consistent often bogus theory concocted by counsel."

23. Of course there is no basis given by Cincinnati Insurance as to the application of this opinion to this case, yet the implication being that Eleanor Posey analysis was not independent and simply parroted Mr. Cochran's counsel. Cincinnati Insurance failed to tell this Court that City of Mobile Fire Marshall Wayne S. Dean came to the fire scene in this case the day after the fire at the request of initial City of Mobile investigator Emmanuel Cook (See Court Doc. 236 / Paragraph #6 with attached report of Emmanuel Cook, page 1, 3 & 4 of report); Fire Marshall Dean viewed the scene, found nothing unusual to continue an investigation and released the scene to Mr. Cochran as a probable electrical fire (See Court Doc. 114 / Paragraph 19; and Also See Court Doc. 91 / Paragraph 5 with attached exhibit). Of course that does not stop

Cincinnati Insurance from pretending that a nationally renowned expert in the field of forensic engineering and fire investigation suddenly decided to abdicate her professional duties and parrot a "bogus theory" apparently shared by the City of Mobile Fire Marshall the day after the fire.

24. What is even more surprising is that Eleanor Posey's "bogus theory" (i.e., electrical fire) is the number one cause of fires in the United States of America. Further, Ms. Posey's "bogus theory" (i.e., electrical fire that began from electrical current leakage from a wire frayed or damaged due to repeated contact with other objects) is a common situation not only acknowledged as legitimate by Cincinnati Insurance's Electrical Engineer, but also a theory that Cincinnati Insurance's Electrical Engineer has cited as the cause of fires he has investigated. (See Owen Posey Deposition, Pages 110-116, attached as Exhibit A).

25. In fact, fires caused by electrical current leakage from a frayed or damaged wire is so common that a company has successfully developed an arc fault circuit interrupter as a safety feature. (See Federal Report of Eleanor P. Posey, Page 12 of 104, attached as Exhibit B).

26. In its motion in limine, Cincinnati Insurance left out much relevant evidence. This Court was not provided Ms. Posey's Report, which would have shown that Ms. Posey opinion included:

> It is my professional opinion that this fire originated on the north wall area of the "bookkeeper's office" in the area behind the right rear corner of the wooden computer desk (as you face the desk) and in the vicinity of the left rear corner of a metal two-drawer filing cabinet adjacent to this computer desk. When Mr. Cochran first saw the flames that fire was already well underway.

13

It is my professional opinion further that this was an
accidental electrical fire involving an extension cord.
The scenario that fits all of the evidence known is that the
trapped extension cord became damaged over time by both
the weight of the metal two-drawer filing cabinet and by the
abrasion action created by the frequent opening and closing
of the drawers of the filing cabinet.

The initial fault would have been a small short circuit leakage
current flowing between the conductor's damaged electrical
insulation. It is also likely that the metal of the filing cabinet
became part of the fault path. In either event this initial fault
was a "high resistance" fault, which would not have had
sufficient current flow to operate the circuit breaker, as the
high resistance of the fault path itself would limit the current
magnitude.

This type of electrical fault can persist for a very long time
without giving any symptoms noticeable to the occupants.
As time goes on the current through the high resistance fault
path produces heat, which further degrades the electrical
insulation, reduces the resistance of the fault enabling more
current to flow, which further degrades the insulation and so
it goes such that the fault of this nature escalates, over time,
creating a local hot spot at the location of the fault which is
quite capable of igniting combustible materials near it. This
high resistance fault can actually glow red-hot at the location
of the fault without tripping a circuit breaker or causing
significant symptoms of the electrical equipment on its same
circuit. Ultimately, however, the resistance of the fault gets
small enough to result in an arcing fault. In this type of
arcing fault there is not the jumping of a gap by an arc
between conductors but an arc is actually conducted over a
high resistance path of damaged, charred insulation and
other conductive material. Flood waters from Hurricane
George

(See attached Exhibit B, Page 10-12 of 104).

27. Ms. Posey goes on to set out the basis for her opinions as follows:

The bases for my opinions are from a number of sources
including all of the photographs, my site inspection,
diagrams, interviews, information reported in reports,
statements, affidavits, depositions, trial testimony, etc., listed

14

at the end of this report.

Further, I considered the following factors:

* The low and severe burn patterns on the back, right side and bottom of the wooden computer desk.

* The high heat pattern starting from the lower rear of the left side of the metal two-drawer filing cabinet.

* The very low and deep charring of the wood structural members of the north wall behind computer desk and filing cabinet.

* The severe damage to the top plate of this wall and building roof over the area behind the computer desk and filing cabinet.

* The burn pattern of the contents of this metal two-drawer filing cabinet, namely, much worse burning on the left rear contents than on the front and right side contents.

* Where the extension cord was found trapped under the left rear corner of the two-drawer metal filing cabinet there was a charred carpet track found under the left rear corner of the metal two-drawer filing cabinet once the filing cabinet was moved. This charred track was in otherwise protected unburned carpet.

* The comparison of the above burn patterns on the north wall behind the computer desk and metal two-drawer filing cabinet with other burn patterns in the room.

* Electrical activity, namely, arcing was seen in this area as well.

(See attached Exhibit B, Page 15-16 of 104).

    28. Because Cincinnati Insurance own electrical engineer has basically admitted

the validity of Eleanor Posey's theory and has admitted to testifying to practically the

identical theory, it is astonishing that Cincinnati Insurance has represented to this Court

15

that Eleanor Posey's theory is bogus.

29. Cincinnati Insurance's electrical engineer ultimately admitted the following during his deposition:

> Q – Mr. Posey, [No relation to Eleanor Posey or her recently deceased husband James E. Posey, Jr.], you would agree, wouldn't you, that the majority of the things that cause short circuits in, say, a house is electrical extensions, you would agree with that statement, wouldn't you?
>
> A - Yes, sir, that's very typical.
>
> Q - Now, you agree that what usually causes electrical extensions to short is the abuse of them?
>
> A -Yes, sir.
>
> Q - An example of that would be TV sets pushed up against the wall where the plug goes into the receptacle and it bends the wire down so that the point of it mashes it.  That would be an example, wouldn't it?
>
> A - Yes, Sir.
>
> Q - And that instance, over a period of time, would start leaking current and it would end up creating a fire.  Isn't that a typical scenario?
>
> A - It could.
>
> Q - And you've seen that many times over your thirty and fifty-year career?
>
> A - I've seen it a few times.
>
> Q - Well, actually, you've seen that many times.  That's a pretty common scenario, isn't it?
>
> A - Not many times, but I've seen it a few times.
>
> Q - Isn't it you opinion that the majority of things that cause short circuits in a house is electrical extensions?
>
> A - That's maybe the one big cause of it, yes sir.

Q – And in those instances, the wire gets hotter and hotter and burns away over a long period of time, sometimes months, doesn't it, depending on the leakage of the current?

A – Well, I wouldn't say months. But, yet, you're right, it depends on the leakage of the current.

Q – But it's possible for it to be months, isn't it?

A – I guess it's possible

Q – In fact, you've testified to that phenomenon in the past, haven't you?

A – I may have.

Q – And when the current starts leaking, it can create a carbon path in its leak;  isn't that true?

A – Yes, sir.

Q – And when that carbon path builds up enough to where it provides enough flow of current, it actually creates an arc, doesn't it?

A – It can.

Q – And then you have a fire usually, don't you?

A –If it's not taken care of, it can develop into a fire.

Q – And you've certainly seen that over your years in your experience.

A – I have.

Q – Now, another thing that can cause these types of electrical fires is putting more current through an extension than it is designed to handle?

A – Yes, sir.

Q – That can make the extension hot and deteriorate over time, correct?

17

A – Yes, sir.

Q – Sometimes months thereby creating an arc which can cause a fire. Isn't that true?

A – It can.

Q – And you certainly have testified to that in the past as an expert, haven't you?

A – I think I have.

Q – This can be called overloading, right?

A – That's correct.

Q – And you would agree that overloading can be accidental.

A – Yes, sir.

Q – And you've testified to that in the past, haven't you?

A – I'm sure I have.

Q – Any you agree that a fire investigator's technique should always include looking at all sources of information that are at a scene and not to go and look at one thing. You would agree with that statement, wouldn't you?

A – Well, that depends.

Q – You've certainly testified to that, haven't you?

A – I may have.

Q – And you agree that that proposition that you've testified to - - -

A – It sounds reasonable.

Q – Now, when you have a point of origin like an appliance, and if the point of origin is where there is an appliance, your would have a burning that generally would leave some kind of indication like an arc or a fire pattern; is that correct?

A – Yes, sir, it should.

Q – When you're shown an electrical cord from an appliance at a fire scene that appears shorted, you've got to identify it as either caused by current or caused by fire; isn't that correct?

A – Well, all shorts in a fire should be identified either caused by fire or caused by a short.

Q – In Matthew Cochran's case, did you find any cords from an appliance that were shorted that you had to make that determination regarding?

A – No, sir.

Q – Now, you would agree that if you sat down on a clothes dryer and one of the feet of the dryer was on the cord, it could, over a period of time, cause that cord to deteriorate and cause a problem such as a fire.

A – Yes, sir.

Q – And you've testified to that in the past, haven't you?

A – I may have.

Q – You have reviewed Mr. Culberson's and Mr. Jim Posey's reports, correct?

A – Yes, sir.

Q – Now, you've seen in those reports the opinions regarding the origin and cause of the fire likely being electrical extension that deteriorated, shorted and caused a fire.

A – Yes, sir.

Q – Much like the scenarios we've just been talking about?

A – That's correct.

(See Exhibit A).

30. As a result of the foregoing sworn testimony by their own proffered expert, it

is remarkable that Cincinnati Insurance has filed the motion in limine regarding Eleanor Posey's identical theory using references such as "bogus theory" and seeking to disallow it.

31. Moreover, the bases for Eleanor Posey's opinions are supported by the original City of Mobile Fire Marshall, Wayne S. Dean, who came to the fire scene the day after the fire at the request of initial City of Mobile investigator Emmanuel Cook (See Court Doc. 236 / Paragraph #6 with attached report of Emmanuel Cook, page 1, 3 & 4 of report); Fire Marshall Dean viewed the scene, found nothing unusual to continue an investigation and released the scene to Mr. Cochran as a probable electrical fire (See Court Doc. 114 / Paragraph 19; and Also See Court Doc. 91 / Paragraph 5 with attached exhibit). The investigation should have been over but this conclusion was unsatisfactory for Cincinnati Insurance, who had Harold Deese come to the fire scene thereafter, remove electrical evidence, alter the scene, declare it arson within hours and thereafter bring Cincinnati Insurance's electrical engineer to the scene to falsely rule out electrical while misrepresenting who removed the electrical evidence and what it consisted of. (See Court Doc. 281 / Paragraph 29 with exhibits and Also See Court Doc. 91 / Paragraphs 4-9 with attached exhibits).

32. Even Cincinnati Insurance's own electrical engineer admitted the existence of some of the major bases of Ms. Posey opinions – notably the obvious significant burn pattern (The "V" Pattern") on the two drawer filing cabinet and the low burn pattern along the north wall behind that filing cabinet ("The Low Burn Pattern") both of which are located where Eleanor Posey has stated the electrical fire originated. The filing cabinet sat on the extension cord that was plugged into the north wall receptacle and traveled

20

along the east wall where the low burn pattern is located. (See Court Doc. 91 /
Paragraph 30 with attached exhibits).

33. As a result of the foregoing, the only tactic remaining for Cincinnati
Insurance in its motion in limine against Eleanor Posey is to attempt to disparage her
reputation through untrue representation to this Court.

34. Cincinnati Insurance attempt to smear Ms. Posey's reputation with this Court
with the statements such as "...Ms. Posey has been the subject of complaints made
against her with the International Association of Fire Investigators. " (See Court Doc.
301-1, Page 10). Cincinnati Insurance filed this motion knowing that there was not only
no truth to this allegations but also that the Court had already addressed this issue as it
related to Ms. Posey's recently deceased husband, James E. Posey, Jr..  In truth Ms.
Posey and her recently deceased husband, Expert James E. Posey, Jr., were the
subject of unsupported attacks by insurance companies and their attorneys, including
Cincinnati Insurance's attorney Michael Beers in an attempt to falsely discredit them to
prevent them from testifying against insurance companies interests, including Cincinnati
Insurance.  David M. Smith, Past President of the IAAI, concluded that the grievance
filed against James E. Posey, Jr., was based upon information from Michael Beers, a
previous attorney at attorney John Richardson's law firm, an insurance company
employee and a private investigator. (See Court Doc. 150 / Paragraphs 13-19 with
attached exhibits)

35. Past President Smith has stated:

> During the 1980s as a member of the International
> Association of Arson Investigators (IAAI), I became well
> acquainted with James (Jim) and Eleanor Posey of
> Alabama. I knew them to be active and productive members

of the Association. they regularly attended the annual meetings of the IAAI and contributing particularly with education and training activities.

In his investigation and stated in his report Mr. Scott confirmed that, several attorneys and investigators, namely, **attorney Mike Beers**, attorney Rod Nelson, State Farm Insurance Company Claims Supervisor Jimmy Plot and private investigator Ralph Newell had gotten together and asked that Mr. Kennedy file this grievance.

**... I found this grievance to be much like a witch hunt, where some employees of insurance companies and several of the attorneys representing these insurance companies, against whom Mr. Posey had testified in the past, apparently effectively, had collaborated, intending to undermine Mr. Posey's future credibility as a fire investigation expert through the IAAI Grievance process.**

**Based upon Mr. Scott's investigation, my observations, my experience and my knowledge of Jim and Eleanor Posey, I concluded there was no basis or merit to this grievance and that this matter should end.**

(See Court Doc. 150 / Paragraphs 17 with attached exhibits)

36.  Edward C. Scott, Past Investigator for the IAAI Grievance Process stated in

part:

Mr. Newell sent me **two additional depositions; one was Eleanor Posey's and one was James E. Posey's, both from the same case ...I read these depositions and, again, I concluded that the investigations and the testimonies as to the conclusions of Eleanor and James E. Posey in this fire incident were just different from those of the defense investigators.**
Also, as part of my investigation, I traveled to Alabama and met face to face with Mr. Posey and his wife Eleanor. They were cooperative and answered all of my questions. This interview too was tape-recorded with their knowledge and permission.
The result of my investigation was that I found no evidence of wrongdoing by Mr. Posey. On the contrary, **it appeared**

22

> **to me that there was merely a difference of opinion
> between Mr. Posey and the persons, namely attorney
> Mike Beers**, attorney Rod Nelson, State Farm Claims
> Supervisor Jimmy Plot and investigator Ralph Newell, who
> Mr. Kennedy said had together requested he file the
> grievance. **Overall, this grievance seemed to me to be a
> group vendetta-like action against Mr. Posey, by
> employees of insurance companies and attorneys who
> represent these companies, who had gotten together in
> order to use the IAAI organization as a means to
> discredit Mr. Posey preventing his effectiveness as an
> expert witness against them in the future. All of these
> people were IAAI members, and some of them were
> Alabama Charter Board members, all whom Mr. Posey
> had either worked or testified against in the past.**

(See Court Doc. 150 / Paragraphs 18 with attached exhibits)

37. Yet, without providing this Court the foregoing substantive information,

Cincinnati Insurance attempts to mislead this Court by utilizing self created false

allegations against Ms. Posey and previously against her recently deceased husband in

an attempt to give the false appearance to this Court that Ms. Posey has done

something improper. As Cincinnati Insurance and its attorney' knew when they filed

their motion, in her twenty-nine (29) years as an electrical engineer / forensic engineer

and fire investigation / fire origin and cause investigator; Ms. Posey has never been

disciplined by any professional organization; has never been disallowed as an expert

including in the areas of electrical engineering / forensic engineering and fire

investigation / fire origin and cause; and, Ms. Posey has never had an expert opinion

stricken including in the same areas.

38. In utilizing *Way v. State of Florida*, 760 So.2d 903 (Fla. 2000) Cincinnati

Insurance attempts to imply that Eleanor Posey was disallowed as an expert witness or

her testimony was stricken, it was not. In a state capital murder case in which the

23

defendants, Mr. Way, was convicted and sentenced to death regarding facts and case

originating in 1983. On post conviction motions in 1990 the Florida Supreme Court

vacated the sentence of death once and remanded to the trial court for resentencing.

*Way v. State of Florida*, 568 So.2d 1263 (Fla. 1990). Subsequently, in 1994 the Florida

Supreme Court, reversed and, again, remanded to the trial for an evidentiary hearing

stating:

> We are unable to conclusively determine from the record
> that this "new" evidence could not support an alternative
> theory of the deaths of his wife and daughter and provide a
> basis on which a jury could find him innocent.

*Way v. State of Florida*, 630 So.2d 177, 178-179 (Fla. 1994)

39. On this second remand, the trial court did not disallow Ms. Posey's testimony

or exclude her opinions, but did write the opinion quoted by Cincinnati Insurance in its

motion. Ms. Posey's opinion would certainly be frustrating to the trial court in the

context of a second remand involving *Brady* issues; however, even the Florida Supreme

Court subsequently acknowledged:

> "In order to support the *Brady* claim, the defense presented
> the testimony of Eleanor Posey, an expert in electrical
> engineering and forensic fire examination ..."

*Way v. State of Florida*, 760 So.2d 903, 909 (Fla. 2000)

40. The trial court completely disagreed with Ms. Posey's opinions but knew that

she was qualified.

41. Cincinnati Insurance even cites a United States Fourth Circuit Court of

Appeals opinion that is not only inapplicable but completely out of context. In *Thomas*

*J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4ᵗʰ Cir.1989), the Fourth Circuit

24

addressed the fact that the plaintiff's sole expert witness on the issue of whether the defendant's shift in credit practices was an unjustified credit discrimination and price discrimination under section 13(a) of the Robinson-Patman Act. Unlike Ms. Posey, the plaintiff's expert had no experience and admitted that she had no experience. In addition, unlike Ms. Posey, the witness had no knowledge, skill, training or education on the issue. The Fourth Circuit made clear that the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training, nor education o the issue fore which the opinion is proffer. *Thomas J. Kline*, 878 at 799-800. As Cincinnati Insurance well knows, Ms. Posey possesses vast amounts of all of the foregoing in the area of electrical engineering / forensic engineer and fire inspection / origin and cause.

42. In *Cincinnati Insurance Company v. Synergy Gas, Inc.*, 585 So.2d 822 (Ala.1991), the trial court had dismissed the complaint of Cincinnati Insurance Company and its insured on the ground that the plaintiffs failed to preserve crucial evidence in the case. On appeal the Supreme Court of Alabama upheld the dismissing of the claims based on the evidence destroyed by the plaintiffs and that the plaintiffs were entitled to proceed to trial solely on the theory related to the only piece of evidence preserved by plaintiff alleged to be the source of the fire. The Court's decisions punishing Cincinnati Insurance were based in part on the opinions of expert Eleanor Posey. *Cincinnati Insurance*, 585 at 822, 824 & 827.

43. Eleanor Posey was Mr. Cochran's forensic engineer expert including while her husband James E. Posey, Jr. was Mr. Cochran's fire origin and cause expert and bad faith expert, prior to his untimely death on Thanksgiving of 2004. Well prior to her

husband's death, Eleanor Posey had already presented sworn, valid and extensive opinions to this Court regarding the investigation of Cincinnati Insurance, Harold Deese and Owen Posey, as well as their improper behavior. (See Court Doc. 105, with attached affidavit of Eleanor P. Posey).

44. When Eleanor Posey's husband died on Thanksgiving of 2004, she was given only twenty-seven (27) days after his completely unexpected death to provide an expert report to Cincinnati Insurance regarding forensic engineering issues, as well as the fire origin and cause issues in a case that spanned 5 1/2 years of litigation and tens of thousands of pages of materials. Twenty-three (23) days after providing the expert report to Cincinnati Insurance, Eleanor Posey was subjected to an approximately nine- (9) hour deposition.

45. Now Cincinnati Insurance is attempting to take bits and pieces of the approximately one hundred (100) page report and four hundred (400) page deposition out of context and, at times, simply misrepresent the full content. Mr. Cochran's response to Cincinnati Insurance's motion in limine would be massive if he were to undertake setting out every such incidence; therefore, in the interests of brevity and judicial resources the following are but a few examples:

One example would be Cincinnati Insurance stating in its motion to this Court:

> "Posey [Eleanor Posey] cites standards such as 'NFPA 921
> and some other forensic ASTM Forensic Science Standard
> Packages' but she does not provide much in the way of how
> those practices interrelate with what occurred in this
> particular case."

(See Court Doc. 301-1, Page 17 of 50).

46. Putting aside the fact that Cincinnati Insurance intentionally did not provide

this court with the entire deposition or expert report referred to and left out the pages

disproving the very statement, Cincinnati Insurance, at times, even specifically

instructed Ms. Posey to only identify the numbers for the standards:

> "And all I'm looking for with this answer is your just give me a
> provision and a site"

(See Eleanor P. Posey Deposition, Page 176 Line 6-8, attached as Exhibit C)

> "I just want you to tell me the number so we can move along.
> Just identify the numbers for us and we can go from there.

(See Eleanor P. Posey Deposition, Page 177 Line 20-22 attached as Exhibit C)

47. Another example would be Cincinnati Insurance states in its motion to this

Court:

> "She [Eleanor Posey] seemed in her report to try to indicate
> that the Fire Marshall's office did not think the fire was
> suspicious but both Emanuel Cook and later Lary Hansen
> with the Fire Marshall's office all believed the fire to be
> suspicious (Exh. C, p. 18).."

(See Court Doc. 301-1, Page 13 of 50).

> "Page 18 of Posey's report contains another statement that
> illustrates the filtering information she received and the
> erroneous conclusions drawn from it"

(See Court Doc. 301-1, Page 26 of 50).

48. Yet, when you look at the cited Exh. C, p. 18 of Eleanor Posey's report it

states,

> "On November 12, 1988, The Fire Marshall came to the fire
> scene, found nothing unusual and released he scene to Mr.
> Cochran."

(See Court Doc. 301-10, exhibit C – Part 3, Page 1 of 104)

49. Ms. Posey's statement was absolutely true. In fact the report of Emmanuel

Cook states, "can't determine the exact cause of this fire" and that "this investigation

has been turned over to Asst. Fire Marshall Wayne Dean". As a result, on November

12, 1998, the day after the fire, Assistant Fire Marshall Wayne Dean came to the fire

scene, viewed the scene, found nothing unusual to continue an investigation and

released the scene to Mr. Cochran as a probable electrical fire (See Court Doc. 114 /

Paragraph 19; and Also See Court Doc. 91 / Paragraph 5 with attached exhibit).

50. As a final note, Cincinnati Insurance takes a passing shot at Ms. Posey's

video of her own experiments regarding an electrical arc not tripping the circuit breaker.

Ms. Posey makes clear that:

Ms. Posey -

"It was done to show what happens when wires are
energized and exposed to fire and show were the fuses or
breaker - - the circuit breakers find it and which ones do and
which ones don't, that type of thing."

(See Eleanor P. Posey Deposition, Page 42 Line 4-9 attached as Exhibit D)

" ... the relevance to it in this case, it had - - several of the
tests that were done in it were done with stranded 18- gauge
conductor which would be like this extension cord [the one in
Mr. Cochran's case], for example, and how it would behave.
I think there's at least three of the ten or 12 tests on that tape
that are those ..."

(See Eleanor P. Posey Deposition, Page 42 Line 11-18 attached as Exhibit D)

"Yeah it has like a story board in it, and it will give you in 18
dash what or twelve two, and also the breaker ampere
rating. Each test has its little story board at the beginning of
the test."

(See Eleanor P. Posey Deposition, Page 42 Line 23 & Page 43 Line 1-4 attached as

Exhibit D)

Cincinnati Insurance Attorney-

"Well, is there any way you would be able to say with any
reasonable degree of certainty that the fires that are in these
experiments with an extension cord would be the same
degree of heat as was in Mr. Cochran's business?"

(See Eleanor P. Posey Deposition, Page 47 Line 5-10 attached as Exhibit D)

Ms. Posey-

"Oh, I think they would be –I think they would be
comparable, yeah.

(See Eleanor P. Posey Deposition, Page 47 Line 11 & 13 attached as Exhibit D)

"... And, also again, I reiterate. The certain degree of heat is
really an irrelevant phenomenon. What you're looking at is
an environment that is similar."

"In the wood burning fire - - and I say I used a wood burning
fire just because many of our structures today are primarily
constructed of wood. They have Sheetrock, too, but the
main structural material is wood."

(See Eleanor P. Posey Deposition, Page 47 Line 18–23 & Page 48 Line 1-4 attached as
Exhibit D)

51. To the extent Cincinnati Insurance has previously unsuccessfully moved this

Honorable Court to strike the opinions of Eleanor Posey, Mr. Cochran moves to strike

Cincinnati Insurance's motion in limine regarding Ms. Posey, or in the alternative to

deny said motion. Said previous motions and orders (Court Doc. 107, 116, 236, 237,

238, 239 and 243) are incorporated by reference as if fully set out herein.

II.    James E. Posey, Jr.

1. The attack against recently deceased fire origin and cause / bad faith expert

29

James E. Posey, Jr., is nothing more than a generalized shot gun approach which fails

to provide this Court with accurate information.

2. As Cincinnati Insurance and its attorneys are well aware, James E. Posey, Jr.

was a premier expert in his field and even lauded by Court for his skill. In *United*

*Services Automobile Association v. Wade*, 544 So.2d 906, an Alabama Supreme Court

case cited by Judge Hand in this case (Court Doc. 116) the Supreme Court upheld a

trial court (bench trial) verdict in favor of the insured for the bad faith denial of the fire

insurance claim in which the Court noted

> "In support of the latter conclusion, the court notes that Mr.
> Lackey's [insurance company investigator] testimony was
> that he knew at once when he looked at the scene that this
> was a fire for profit. This is totally unbelievable and
> outrageous, and becomes more so when balanced against
> the thorough, careful, professional investigation conducted
> by Mr. Posy [James E. Posey, Jr. - Mr. Cochran's expert
> prior to his untimely death in November 2004]. The
> allegation of arson is a very serious allegation, and in good
> faith, the insurer owes to its insured a very thorough
> investigation. To the contrary, in the instant case, it is clear
> to this court from the evidence that USAA set out, within
> forty-eight hours of this fire, to find some means by which to
> deny their lawful obligation under the contract. To that end,
> they employed at best incompetent investigators, and at
> worst, unscrupulous ones."

544 So.2d 909-910.

3. James Posey's reputation and skills were such that  even Cincinnati

Insurance's attorney Michael Beers has attempted to falsely discredit him in an attempt

to undermine his effectiveness as an expert against the interest of Michael Beer's

clients.

4. David M. Smith, Past President of the IAAI has stated in part:

During the 1980s as a member of the International Association of Arson Investigators (IAAI), I became well acquainted with James (Jim) and Eleanor Posey of Alabama.  I knew them to be active and productive members of the Association.  they regularly attended the annual meetings of the IAAI and contributing particularly with education and training activities.

In his investigation and stated in his report Mr. Scott confirmed that, several attorneys and investigators, namely, **attorney Mike Beers**, attorney Rod Nelson, State Farm Insurance Company Claims Supervisor Jimmy Plot and private investigator Ralph Newell had gotten together and asked that Mr. Kennedy file this grievance.

... **I found this grievance to be much like a witch hunt, where some employees of insurance companies and several of the attorneys representing these insurance companies, against whom Mr. Posey had testified in the past, apparently effectively, had collaborated, intending to undermine Mr. Posey's future credibility as a fire investigation expert through the IAAI Grievance process**.

**Based upon Mr. Scott's investigation, my observations, my experience and my knowledge of Jim and Eleanor Posey, I concluded there was no basis or merit to this grievance and that this matter should end.**

(See Court Doc. 150 / Paragraphs 17 with attached exhibits)

5.  Edward C. Scott, Past Investigator for the IAAI Grievance Process has stated

in part:

Mr. Newell sent me **two additional depositions; one was Eleanor Posey's and one was James E. Posey's, both from the same case ...I read these depositions and, again, I concluded that the investigations and the testimonies as to the conclusions of Eleanor and James E. Posey in this fire incident were just different from those of the defense investigators.**
Also, as part of my investigation, I traveled to Alabama and met face to face with Mr. Posey and his wife Eleanor.  They were cooperative and answered all of my questions.  This

31

interview too was tape-recorded with their knowledge and permission.

The result of my investigation was that I found no evidence of wrongdoing by Mr. Posey. On the contrary, **it appeared to me that there was merely a difference of opinion between Mr. Posey and the persons, namely attorney Mike Beers**, attorney Rod Nelson, State Farm Claims Supervisor Jimmy Plot and investigator Ralph Newell, who Mr. Kennedy said had together requested he file the grievance. **Overall, this grievance seemed to me to be a group vendetta-like action against Mr. Posey, by employees of insurance companies and attorneys who represent these companies, who had gotten together in order to use the IAAI organization as a means to discredit Mr. Posey preventing his effectiveness as an expert witness against them in the future. All of these people were IAAI members, and some of them were Alabama Charter Board members, all whom Mr. Posey had either worked or testified against in the past.**

(See Court Doc. 150 / Paragraphs 18 with attached exhibits)

6. As with expert Eleanor P. Posey, in the absence of legitimate legal basis

Cincinnati Insurance turns to providing misinformation to this Court in an attempt to

undermine James Posey's opinions.

7. One example would be Cincinnati Insurance representing to this Court:

"Mr. Posey claim Harold Deese should not have removed the cords before Owen Posey had an opportunity to examine them. (J Posey depo., pp. 29-31) However, Edward S. Paulk, Assistant Alabama State Fire Marshal, stated it is not necessarily improper to remove evidence from a scene in order to preserve it. (Edward Paulk Deposition, Exhibit "R", p. 40)."

(See Court Doc. 301-1, Page 28 of 50).

8. n fact, not only has Harold Deese and Owen Posey testified that Harold

Deese did not remove electrical evidence form the scene prior to Owen Posey coming

to the scene but Harold Deese has also provided a supplemental expert report stating:

"This is not true, and it has not been proven that such a

> receptacle was removed by me prior to Owen Posey arrival.
> The reason for calling Owen Posey was to inspect all of the
> electrical items in place, so that he could trace the wiring, as
> he needed, in order to establish his opinion."

See Harold Deese October 28, 2004 Supplemental Expert Report, Page3 attached as
Exhibit E)

9. The only problem is that an eye witness saw Harold Deese stuffing two boxes

of electrical evidence in his car trunk and leaving with it the day before Harold Deese

brought Owen Posey to the fire scene and after Harold Deese had already concluded it

was arson. (See Court Doc. 91 / Paragraphs 8 with attached exhibit).

10. Another example of misrepresentation would be Cincinnati Insurance's

statement to this Court that:

> "Mr. Posey criticized Harold Deese for not taking comparison
> samples but when asked if he took comparisons, Mr. Posey
> stated no."
> (See Court Doc. 301-1, Page 31 of 50).

11. In truth, Cincinnati Insurance destroyed key evidence, such as the carpet

and filing cabinet destroyed immediately after Harold Deese came to the fire scene and

months prior to Cincinnati Insurance even informing Mr. Cochran that they had

concluded arson. (See Troy Lary Deposition, Page 122 Line 23 & Page 123 Line 1-14,

attached as Exhibit F).

12. Mr. Cochran moves to strike Cincinnati Insurance' motion in limine regarding

James E. Posey, Jr., or in the alternative to deny said motion in that Cincinnati

Insurance has previously filed motion regarding his expert qualifications and opinions,

all of which were unsuccessful or denied. Said previous motions and orders (See Court

Doc. 58, 59, 76, 83, 92, 93, 96, 105, 106,116, 236, 237, 239 and 243) are incorporated

by reference as if fully set out herein.

III.    Pyron Pounds and Jessie Sprayberry

1.  Cincinnati Insurance originally utilized attorney John Richardson to administer

a six-(6) hour examination under oath of Mr. Cochran during the claims adjusting

process prior to formally denying the claim.  During the examination under oath,

Attorney Richardson followed up on Cincinnati Insurance investigator Anthony

Fischetti's question of whether Mr. Cochran was willing to submit to a polygraph

examination.  Mr. Cochran informed Mr. Richardson that he obtained a polygraph exam

from the chairman of the State of Alabama Polygraph Examiners Board and, at

Cincinnati Insurance's request gave attorney Richardson a copy of that report.  On

behalf of Cincinnati Insurance Attorney Richardson stated to Mr. Cochran during the

examination under oath :

"…Let me put on the record, I request a copy of it after you consult with your

lawyer and y'all let me know what you want to do with that."

"…I just need a copy of it for my file.  And we will put it in the consideration on

this thing."

2.  The report provided by Mr. Cochran to Cincinnati Insurance at its request

contained in part the following:

> Q.    Regarding that fire at your shop last November, do
> you intend to answer truthfully each question about that?
> A..    Yes.
> Q.    Did you deliberately cause that fire?
> A.    No.
> Q.    Did you do anything to cause that fire to start last
> November?
> A.    No.
> Q.    Did you know even one minute in advance that the
> fire was going to happen?

A.     No.

ANALYSIS AND CONCLUSIONS:
In the present case, that of Matthew Leath Cochran, the
grand Total obtained by analysis of the polygrams is '+15',
clearly indicating that deception was not attempted to the
relevant questions asked.

(See Court Doc. 91 / Paragraph 32 with attached exhibits).

3. This report is that it was specifically requested by Cincinnati Insurance during

their purported processing of Mr. Cochran's claim and represented to Mr. Cochran that

they would consider the polygraph report in their decision making process.

4. The results of the polygraph examination  are presented not on the issue of

Mr. Cochran's responsibility for the fire, but on the question , as it relates to the bad faith

and conspiracy to commit bad faith claims,  of Cincinnati Insurance's state of mind, that

is, on whether  Cincinnati Insurance upon consideration of the results of the test, had a

reasonable basis for concluding that Mr. Cochran was an arsonist and/or denying the

claim.  See *Moskos v. National Ben Franklin Insurance Company*, 376 N.E.2d 388, 392.

The threshold issue is whether the insured willingness to submit to a polygraph

examination is relevant pursuant to Rule 401 of the Federal Rules of Evidence. Thus,

admissibility turns on the relationship of the proffered evidence to other facts of the

case, regardless of whether the results of polygraph tests are admissible.  An insured's

willingness to cooperate in an insurance company's investigation and request of a

polygraph examination does not depend on the scientific acceptability which is

necessary to support the admissibility of polygraph test results.  The polygraph

examination reflects upon Mr. Cochran's credibility and the Cincinnati Insurance's

motive in refusing the claim.  See *Murphy v. Cincinnati Insurance Company*, 772 F.2d

273, 277.

5. Mr. Cochran moves to strike Cincinnati Insurance' motion in limine regarding Pyron Pounds and Jesse Sprayberry or in the alternative to deny said motion in that Cincinnati Insurance has previously filed motion regarding this expert, which was unsuccessful or denied. Said previous motions and orders (See Court Doc. 76, 93, 105, 236, 237, 239 and 243) are incorporated by reference as if fully set out herein.

IV.    Donald Mosley

1. Again, Cincinnati Insurance attacks the credibility and qualifications of the expert. Amongst other things, in the 1960s Mr. Mosley attended broadcast engineering school in New Orleans and received the first class engineer's license in broadcast engineering, the technical aspects of radio. Broadcast engineering involves being able to operate the sound board, being able to repair the equipment if necessary, being able to go down to the component level to modify the equipment, to make the necessary repairs to make sure that the recorders were operating properly. Anything technically in the station.

(See Court Doc. 301-61, Exhibit T-Part 1, Page 6 of 9)

2. Also during the 1960s, Mr. Mosley was hired as an engineer and on-the-air-person. We totally rewired the station and rebuilt it . Ultimately, in the 1970s he purchased and operates Sound of Birmingham Recording.

(See Donald Mosley Deposition, Page 11 Line 21-23 & Page 12 Line 16, attached as Exhibit G).

3. Mr. Mosley does recordings in the radio commercial field, audio for TV, score

music for pictures, (ex. Six of the George W. Bush commercials that ran across the

country), loop in audio, sound recording for commercial, operates a recording studio

and production company.

(See Donald Mosley Deposition, Page 12 & 13, attached as Exhibit G).

4. Mr. Mosley has also taught courses regarding the field of audio engineering at

the University of Alabama at Birmingham. (See Court Doc. 301-61, Exhibit T- Part 1,

Page 3 of 9).

5. In approximately 1974, Donald Mosley began performing forensic audio

analysis at the request of law enforcement. Mr. Mosley has done work for firms in San

Francisco and has appeared as an expert witness, including in the United States District

Court for the Middle and Northern District of Alabama.

(See Donald Mosley Deposition, Page 14, 15, 32-37 attached as Exhibit G).

6. Cincinnati Insurance has again attacked a qualified witness through suspect

means such as stating to this Court:

> Mosley further testified that he only looked for the initiation of
> the "record signature" a recording device leaves during a
> recording and did not review or examine for an end of record
> signature:
>
> Q.    But there is no end of record signature that you identified?
>
> A.    I did not look for one.
>
> Q.    Would there be one?
>
> A.    There could possibly be.
> (Mosley dep., p. 80).

(See Court Doc. 301-1, Page 36 of 50).

7. Putting aside the fact that Cincinnati Insurance provided no explanation as to

the significance of this representation, they also did not provide this court with Mr.

Mosley's complete response. In fact, Mr. Mosley went on to state that,

> "I did not look for one. It was only necessary to find the start
> of the record signature because that is what identified it as
> the machine that did the erasure as the one that did the
> recording."
> (See Court Doc. 301-61, Exhibit T-Part 4 Page 2 of 8).

Cincinnati Insurance also states to this Court:

> "The reliability of Mr. Mosley's conclusory conclusions are
> suspect when they contradict one another. The first affidavit
> which was rendered by simply listening to the tape sets forth
> two scenarios to explain the erasure that occurred on the
> tape. The second affidavit again containing conclusory
> conclusions provided a source of the erasure outside the two
> scenarios provided in the first affidavit"
> (See Court Doc. 131-1, Page 38 of 50).

8. This position is absurd and without any basis. Earlier in it brief to this Court ,

Cincinnati Insurance even suggests that somehow Mr. Mosley's opinion that, (1)

someone utilized two recorders and operated a pause button in an attempt to edit the

tape and (2) that the same recorder that made the original audio is the same recorder

that did the erasure, are somehow incongruent.. It is no intellectual exercise to

understand that the recorder Harold Deese used to record the original audio is also one

of the two recorders used in the erasure.

9. Lastly, Cincinnati Insurance would have this Court exclude Mr. Mosley's

opinion because the software has ceased functioning that was utilized in the analysis

and the company supporting the software has been purchased by another company.

Mr. Mosley has provided the printout of the data from the analysis as well as the basis

of his opinions; therefore there is no basis for Cincinnati Insurance's request. (See

Donald Mosley Deposition, Pages 51-55, attached as Exhibit G).

10. Mr. Mosley has even offered to again conduct the analysis for Cincinnati Insurance with new software but Cincinnati Insurance has repeatedly opposed this opportunity. (See Court Doc. 110, 111, 214 & 217).

11. Mr. Mosley is not a professional witness but someone who for over 30 years has analyzed audio recordings at the request of law enforcement and private parties. He has never been disallowed as an expert witness nor had an opinion stricken by a court of law.

12. Mr. Cochran moves to strike Cincinnati Insurance' motion in limine regarding Don Mosley or in the alternative to deny said motion in that Cincinnati Insurance has previously filed motion regarding this expert, which was unsuccessful or denied. Said previous motions and orders (See Court Doc. 110, 111, 114, 116, 214, 217, 236, 237, 239 and 243) are incorporated by reference as if fully set out herein.

V.      Daniel L. Koch

1. Dr. Koch has a Ph.D. in psychology and is licensed with the State of Alabama and during his thirty-(30) year career he provided consultation for the University of South Alabama Department of Neurosurgery, the Federal Bureau of Investigation and Forensic Traumatology. Dr. Koch is a member of many professional organizations, including the American Academy of Expertise in Traumatic Stress. Dr. Koch also has amble teaching experience.

2. Dr. Koch originally evaluated Mr. Cochran in 1999 following the fire. Therefore, Dr. Koch was asked to reaffirm his findings from 1999 thereby causing him to

perform current evaluations in order to ensure his findings from his evaluations in 1999. The result is that Dr. Koch concludes that Mr. Cochran does not suffer from a mental illness, that it is traumatic to find yourself in a fire and trauma typically creates the suspension of critical thinking. Based on Mr. Cochran's rendition of the facts, which agree with his rendition in 1999, Dr. Koch found nothing remarkable about Mr. Cochran's response at the discovery of the fire.

3. Cincinnati Insurance was provided with an extensive amount of Dr. Koch's data and Cincinnati Insurance declined to even take his deposition.

(See Court Doc. 301-5, Exhibit U - Parts 1-7).

VI.   Lewis K. Pannell

1. Dr. Pannell's credentials in the field of mass spectrometry and gas chromatography are unparalleled. Cincinnati Insurance's attempts to attack Dr. Pannell, much like its attacks on Mr. Cochran's other experts is unfounded and often the result of it presenting misinformation to the Court or presenting information out of context to this Court.

2. In the interest of judicial time and resources, Mr. Cochran has simply attached Dr. Pannell's Curriculum Vitae and report as Exhibit H & I. It is obvious that Dr Pannell is imminently qualified to review the work of Cincinnati Insurance's Forensic Analyst Laurel Waters.

3. Laurel Waters failure to make notes of her original procedure, her destruction of her computer data and her failed attempt to explain how she could render a quantitative opinion six years after conducting a qualitative analysis was shredded by

Dr. Lewis Pannell, who is an internationally renowned expert and Head of the Proteomics and Mass Spectrometry research Facility and Professor of Biochemistry and Molecular Biology at the Cancer Research Institute, College of Medicine of the University of South Alabama. (See Parties Proposed Supplement to Pretrial Order with attached Dr. Pannell Deposition, Pages 127-131, 141-150).

4. Dr. Pannell made clear that not only was Laurel Water's quantitative conclusion without any basis, but also that a proper calculation would have rendered a very different conclusion.

## CONCLUSION

The basis of Cincinnati Insurance's objections to Mr. Cochran's expert witnesses includes criticisms of theories and opinions that were clearly stated and held by Cincinnati Insurance's own experts. Cincinnati Insurance has attempted to provide this Court with incorrect information or information completely out of context in order to caste Mr. Cochran's experts in a false light. The amount of time required to respond to Cincinnati Insurance's clearly baseless objections is oppressive; therefore, Mr. Cochran would request that the time, fees and costs of such an endeavor be assessed against Cincinnati Insurance.

**WHEREFORE** the above matters considered, Mr. Cochran respectfully requests that this Honorable Court would enter an Order denying Cincinnati Insurance's Motion in Limine; assess the time, cost and fees against Cincinnati Insurance, and such other relief as this Honorable Court deems appropriate.

STEPHEN M. TUNSTALL, P.C.

By: s / Stephen M. Tunstall
 **Stephen M. Tunstall** (TUNSS4180)

**OF COUNSEL**:
250 Congress Street
Post Office Box 152
Mobile, Alabama 36601
(251)432-2221

## CERTIFICATE OF SERVICE

I hereby certify that on 22nd day of June, 2005, I electronically filed the foregoing
with the Clerk of the Court using the CM/ECF system which will send notification of such
filing to the following:

Michael B. Bears, Esquire mbeers@beersanderson.com, tina@beersanderson.com
William F. Patty, Esquire bpatty@beersanderson.com,debbie@beersanderson.com
Angela C. Taylor, Esquire ataylor@beersanderson, tina@beersanderson.com
BEERS, ANDERSON, JACKSON, PATTY & VAN HEEST
Post Office Box 1988
Montgomery, Alabama 36102

                                    s / Stephen M. Tunstall
                                    Stephen M. Tunstall