**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **THE CINCINNATI INSURANCE CO.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 99-0552-WS-C** |
| | ) | |
| **MATTHEW LEACH COCHRAN, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on the plaintiff's motion in limine regarding certain of the defendants' expert witnesses.  (Doc. 301).  The defendants have responded, (Doc. 310), and the motion is ripe for resolution.  After carefully considering the foregoing materials and other relevant materials in the file, the Court concludes that the motion is due to be granted in part and denied in part.[1]

**BACKGROUND**

On the night of November 11, 1998, a fire damaged the premises of defendant Foreign Auto Parts of Mobile, Inc.  ("Foreign Auto Parts").  Defendant Cochran, the business owner, acknowledges that he was in the building when the fire began but denies that he set it.  A succession of individuals investigated the fire, with several concluding or supporting the conclusion that it was the result of arson. The plaintiff, which insured the premises, declined to pay and filed this declaratory action.  The defendants counterclaimed, inter alia, for breach of contract and bad faith.

The present motion seeks to exclude the testimony of six expert witnesses for the defendants. The primary ground is the defendants' asserted failure to satisfy the requirements of Federal Rule of Evidence 702, as amplified by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

---

[1]The defendants' multiple, unlabeled motions to strike the motion in limine, (Doc. 310 at 29, 33, 36, 39), are **denied**.  The defendants' request for an award of fees and expenses, (*id*. at 41), is also **denied**.

(1993), and like cases.  The motion includes additional, isolated challenges based on Rules 401, 402 and 403.

## DISCUSSION

The requirements for the admission of expert testimony in light of *Daubert* are well known and need not be regurgitated at length herein.  "Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue."  *City of Tuscaloosa v. Harcros Chemicals, Inc*., 158 F.3d 548, 562 (11th Cir. 1998)(footnote omitted).  There are thus three discrete inquiries: qualifications, relevance, and reliability.[2]  The burden of establishing these three requisites lies with the proponent.  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)(en banc).[3]

An expert may be qualified "by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  An expert is not necessarily unqualified simply because her experience does not precisely match the matter at hand.  *See Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)(an economic expert was qualified even though he "ha[d] no real estate development experience and thus no basis to opine regarding how the pilfered funds would have been invested by the Plaintiffs"); *id*. at 669 (expert knowledgeable concerning the practices of Mexican immigration authorities generally was qualified to testify even though he had no experience with Monterey officials in particular).

To the requirement of Rule 401 that evidence possess a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable," Rule

---

[2]*See Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)(although there is "some overlap" among these inquiries, they "are distinct concepts that courts and litigants must take care not to conflate").

[3]Expert testimony must also satisfy other applicable rules of evidence, including Rules 401, 402 and 403.  *Allison v. McGhan Medical Corp*., 184 F.3d 1300, 1309 (11th Cir. 1999).

702 adds that expert evidence must "assist the trier of fact to understand the evidence or to determine a fact in issue." The evidence must "concern matters that are beyond the understanding of the average lay person. ... Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *United States v. Frazier*, 387 F.3d at 1262-63. In addition, the expert evidence "must have a valid scientific connection to the disputed facts in the case." *Allison v. McGhan Medical Corp*., 184 F.3d 1300, 1312 (11th Cir. 1999). That is, there must be an adequate "fit" between the evidence and the case, which may be lacking, for example, when the expert attempts to extrapolate animal studies into the human sphere. *Rider v. Sandoz Pharmaceuticals Corp*., 295 F.3d 1194, 1202 (11th Cir. 2002).

The most heavily litigated component of the *Daubert* analysis, in this case as generally, is reliability. Expert testimony "must be 'scientific,' meaning grounded in the methods and procedures of science, and must constitute 'knowledge,' meaning more than subjective belief or unsupported assumptions." *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004). Rule 702 identifies three components of the reliability element: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

*Daubert* identifies several non-exclusive factors that a court may consider as appropriate in gauging the reliability of the principles and methods utilized by the expert: (1) whether the methodology has been, or is amenable to, testing; (2) whether it has been subjected to peer review and/or publication; (3) the known and potential error rate of the methodology; and (4) whether it has been generally accepted in the relevant scientific community. 509 U.S. at 593-94. "Notably, ... these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). Among such factors, "[i]n evaluating the reliability of an expert's method, ... a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005).

Whatever factors are considered, the Court's focus should "be solely on principles and methodology, not the conclusions they generate." *Allison v. McGhan Medical Corp*., 184 F.3d at 1312 (internal quotes omitted). It is therefore error to conflate admissibility with credibility, as by considering the relative weight of competing experts and their opinions. *Quiet Technology v. Hurel-Dubois*, 326 F.3d at 1341. Thus, for example, "a district court may not exclude an expert because it believes the expert lacks personal credibility because of prior bad acts or other prior instances of untruthfulness." *Rink v. Cheminova*, 400 F.3d at 1293 n.7.

With respect to the third reliability criterion of Rule 702, errors in an expert's application of a reliable method generally implicate credibility rather than reliability. *See Quiet Technology v. Hurel-Dubois*, 326 F.3d at 1345-46 (using incorrect numbers in a reliable formula is not grounds for exclusion under *Daubert*).

Certain additional observations are worth making. "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough [to carry the proponent's burden]." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1113 (11th Cir. 2005). Similarly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." *Id*. at 1111 (internal quotes omitted). An expert's unexplained assurance that her opinions rest on accepted principles fares no better. *McClain v. Metabolife International, Inc*., 401 F.3d 1233, 1222 (11th Cir. 2005).

Moreover, "[t]he *Daubert* requirement that the expert testify to scientific knowledge — conclusions supported by good grounds for every step in the analysis — means that *any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain v. Metabolife*, 401 F.3d at 1245 (emphasis in original)(internal quotes omitted); *accord Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir. 2003) ("[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion.").[4]

---

[4]Having set forth these governing principles, the Court will not repeat them each time one becomes applicable to a particular expert or argument advanced by the parties.

Neither side has requested a hearing. A trial court's decision whether to hold such a hearing is committed to its sound discretion, *Cook v. Sheriff of Monroe County*, 402 F.3d at 1113, and absent a request the Court concludes that no hearing is required. *Cf. id.* at 1108, 1114 (no abuse of discretion in failing to hold a hearing when not requested). Even when a hearing is requested, the court has discretion to deny the request, especially when the case is not a complicated one involving multiple expert witnesses. *E.g., United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001). Although there are multiple expert witnesses in this case, their testimony is not — despite the best efforts of the parties to suggest otherwise — particularly complicated, especially compared with those cases involving dueling medical evidence as to which a hearing may be a fruitful exercise. *See id.* (trial court should grant a motion for hearing when the opponent presents conflicting medical literature and expert testimony).

**A.  Eleanor Posey.**

Posey has been identified as an "electrical engineer [and] fire origin and cause expert." (Doc. 297 at 41). Within this rubric, the defendants intend to apprehend, in addition to the common reach of these terms, the subjects of "altering the fire scene/evidence, spoliation of evidence and the bad faith investigation of the alleged co-conspirators." (*Id.*).[5]

**1.  Qualifications.**

Posey has a bachelor's degree in engineering, with a major in electrical engineering. She completed 75% of the course work for a master's degree in electrical engineering. (Doc. 301, Exhibit A). The plaintiff's only objection is that Posey "has no work experience as a practicing engineer," (Doc. 301 at 9), but her C.V. reflects that she is a registered professional engineer, a designation which required at least four years of relevant work experience. (*Id.*, Exhibit A).

---

[5]The plaintiff objects on numerous grounds to Posey's opinion that Cochran's behavior was consistent with that of other fire victims. (Doc. 301 at 24). Because Posey has not been timely identified as an expert for this purpose, she may not offer expert testimony in this regard. At any rate, she is plainly unqualified to render any such opinions.

With respect to fire cause and origin, Posey has practiced forensic engineering with her father's firm for over 20 years. She has been certified in forensic engineering by the Council of Engineering Specialty Boards. She is certified by the National Association of Fire Investigators as a fire and explosion investigator and as a fire investigation instructor. She has authored articles on, and participated in many continuing education offerings on, such things as electrical fires and fire/arson investigation. Other qualifications appear in her C.V. (Doc. 301, Exhibit A).

The plaintiff raises two challenges to Posey's qualifications as an expert in fire cause and origin. First, that Posey has no "practical experience" in the field, such as firefighting or working as an investigator for an insurance company or government agency; and second, that Posey gained her relevant experience "as a professional witness." (Doc. 301 at 9). The plaintiff offers no authority for the proposition that a past life as a firefighter or investigator is a predicate for qualification as a cause and origin expert, and the very evidence it cites reflects that Posey has given deposition or trial testimony only eight times in the past four years. (*Id*., Exhibit B).[6]

In an apparent attack on Posey's qualifications, the plaintiff asserts that she "has been the subject of complaints made against her" with the International Association of Arson Investigators ("IAAI"). (Doc. 301 at 10). The plaintiff offers no details of these complaints, and the defendants have provided affidavits from the then-president of the IAAI and the investigator concluding there was nothing to substantiate a December 1989 grievance/complaint by one Roland Kennedy. (Doc. 150, Affidavits of David M. Smith, Edward C. Scott).[7]

As noted, Posey is expected to offer expert opinions concerning alteration/spoliation and bad faith investigation. The plaintiff does not challenge Posey's qualifications concerning the former and, as an expert in fire cause and origin with experience and training in fire and arson investigation, she presumably is qualified to testify as to appropriate steps for investigators in preserving the scene and

---

[6]The plaintiff ignores any earlier period, but the defendants represent that Posey has been asked to testify approximately 100 times over the past 30 years, (Doc. 310 at 11), or about three times a year.

[7]These affidavits were filed in April 2004. The plaintiff's inability to counter them over a year later is strongly persuasive that the defendants' version is correct.

evidence.

The plaintiff does challenge Posey's qualifications to offer expert testimony as to the alleged bad faith nature of the investigation.  (Doc. 301 at 16).  Again, however, Posey appears fully qualified to testify as to the components of a proper fire investigation and how the plaintiff's agents may have strayed from the ideal, and those deviations may indicate bad faith to the jury.  Posey does not, however, possess any identified qualifications to testify as to the components of a proper insurance investigation or other insurance practices.  Thus, she may offer opinions only with respect to the actual investigation of the fire and its cause and origin, not other aspects of the plaintiff's acts and omissions.

Nor has Posey been shown to possess qualifications as an expert to characterize the plaintiff's fire investigation as reflective of bad faith or spoliation.  She may know what ought to be done in a fire investigation, but there is no indication that she has specialized knowledge as to whether a failure to do all that ought to be done is the result of bad faith or spoliation, both of which terms presuppose an understanding of the actor's mental state.  Alternatively, and as discussed in Part A.2, any such opinion from Posey would concern a matter within the jury's understanding and therefore would not be relevant for purposes of Rule 702.  Thus, Posey may not testify to the effect that the fire investigation of the plaintiff or any individual suggests bad faith or that the treatment of the scene or evidence suggests spoliation.

Posey apparently offers criticisms of plaintiff's expert Laurel Waters, who tested samples provided her by plaintiff's investigator Harold Deese.[8]  As Posey has not been shown to possess any qualifications in the fields of gas chromatography and mass spectrometry, she may not offer testimony critical of Waters.[9]

In summary, Posey is generally qualified to render expert opinions concerning electrical engineering and fire cause and origin, including her theory concerning the cause and origin of the instant fire.  She is also qualified to offer expert opinions concerning the components of a proper fire

---

[8]The plaintiff fails to provide record cites to these opinions.  (Doc. 301 at 21).

[9]As discussed in the Court's order on the defendants' motion in limine, the only opinions Waters may offer concern her qualitative testing of the samples.

investigation and any deviation therefrom in this case.  However, she is not qualified to render expert opinions: (1) concerning proper insurance practices; (2) that the fire investigation of the plaintiff or any individual is indicative of bad faith or spoliation; or (3) the testing of samples by Waters or any other witness.

### 2.  Relevance.

The plaintiff argues that Posey's opinion concerning the alleged bad faith and spoliation of the plaintiff and its representatives "does not meaningfully assist the jury."  (Doc. 301 at 30-31).  The Court agrees.  Once Posey sets forth the components of a proper fire investigation and the plaintiff's deviations therefrom, the jury is as capable as she of drawing an inference of bad faith or spoliation, and her opinion would offer nothing more than what defense counsel can argue in closing.

### 3. Reliability.

The plaintiff offers up a jumbled mass of challenges to the reliability of Posey's opinions, which may be conveniently organized into four clusters: (1) bias; (2) unprofessional practices; (3) dismissal of conflicting evidence; and (4) unsupported opinions.

### i.  Bias.

The plaintiff notes Posey's statement that she "became aware of many aspects of the fire" some time before being retained as an expert (because she was married to James Posey, then a defense expert) and became "distressed ... at what appeared to [her] to be leading to an extremely troubling miscarriage of justice."  (Doc. 301, Exhibit C at 5).  The plaintiff objects that this comment reflects that Posey "formed opinions before becoming a retained expert" and did so based on "filtered information from her husband" rather than from her own investigation.  (Doc. 301 at 11).  The plaintiff concludes that Posey has a "predisposition to bias."  (*Id*. at 15).

As a threshold matter, the deposition excerpt cited by the plaintiff, (Doc. 301 at 11), reflects that Posey formed no opinions concerning cause and origin before being retained, but only concerning

the quality of the plaintiff's investigation.  (Doc. 301, Exhibit D at 230-31).  Thus, her opinions concerning cause and origin are not implicated by the plaintiff's argument.

Nor has the plaintiff demonstrated bias with respect to Posey's opinions concerning the plaintiff's investigation.  It would be strange indeed if experts were barred from forming tentative opinions based on partial information but instead were required to maintain an "empty head" until all available information had been reviewed.[10]

The plaintiff next argues that Posey's bias is reflected in the "limited amount of information she reviewed."  (Doc. 301 at 12-14).  While the plaintiff questions whether Posey reviewed a number of sworn and unsworn statements, the deposition pages it cites, as well as Posey's report, show that she did or probably did review most of them, even if her memory of having done so is sketchy.[11]  The remaining statements at issue are those of Cochran to the police; of Cochran in his examination under oath; of Leonard Burroughs; and the affidavit of Emmanuel Cook.  These alleged omissions may provide fodder for questioning the thoroughness of Posey's investigation, but they are not so widespread as to support disqualification of the witness.  Indeed, the plaintiff has failed to show or even suggest that Posey was aware of these materials, and without such awareness she could hardly have ignored them out of bias.[12]

The plaintiff also argues that Posey's bias is shown by her verbatim incorporation of portions of her late husband's report within her own, and by her denial that she did so.  (Doc. 301 at 10-11, 16).  The plaintiff focuses on the sentence, "I found 11 circuit breakers 'tripped' on the electrical panel which

---

[10]Such a rule might well disqualify plaintiff's expert Emmanuel Cook, who admittedly did not perform a complete investigation before pronouncing the fire "suspicious."  (Doc. 236, Exhibit F).

[11]This includes the statement and affidavit of Peter Preston; reports from the Mobile Fire Department, including that of Emanuel Cook; the trial testimony of Owen Posey and Harold Deese; and the affidavits of Messrs. Laney and Watkins.  (Doc. 301, Exhibit D at 98, 182-84, 227-28, 303-05; *id*., Exhibit C at 101-04).

[12]In a related and similarly unsuccessful vein, the plaintiff suggests that defense counsel intentionally withheld these documents from Posey in an effort to manipulate her opinions, so that Posey's report reflects counsel's bias if not her own.  (Doc. 301 at 14, 26).

was located too far from the area of the fire for the heat of the fire to explain why they were tripped," which language appears in both reports. (*Id*. at 15). The plaintiff emphasizes this sentence because, the plaintiff says, it shows that Posey was purporting to find something that her husband actually found. (*Id*.). However, in the deposition excerpt cited by the plaintiff, (*id*. at 11, 15), Posey explained that she did confirm from photographs the factual information found in the quoted sentence. (*Id*., Exhibit D at 208-09).

The Court has reviewed those portions of the two reports identified by the plaintiff and concurs that Posey incorporated verbatim entire paragraphs of her late husband's report totaling approximately 7½ pages.[13] The plaintiff, however, has failed to explain or support its position that Posey's practice demonstrates that she held no independent opinions but merely "parroted" her husband's. (Doc. 301 at 11). As a threshold matter, the textual portion of Posey's report consumes 104 pages, so that most of her report was not drawn verbatim from her husband's. Second, Posey offered the apparently benign explanation that, following her husband's unexpected death, she had a limited amount of time within which to complete her report due to court-imposed deadlines and that she used her husband's report as a guide and to ensure that she did not omit information and opinions she intended to include. Third, it is a commonplace that an expert may rely on the work of other experts in forming her opinions, Fed. R. Evid. 703, and "when an expert relies on the opinion of another, such reliance goes to the weight, not the admissibility of the expert's opinion." *Ferrara & DiMercurio v. St. Paul Mercury Insurance Co.*, 240 F.3d 1, 9 (1st Cir. 2001).

The plaintiff next points evidence that Posey's report "was prepared with the assistance of counsel" as showing her bias and lack of independent judgment. (Doc. 301 at 11, 16). That "assistance," as disclosed by the deposition excerpt cited by the plaintiff, consisted of typing portions of her report at her direction. (*Id*., Exhibit D at 205).

Finally, the plaintiff argues that Posey's willingness to opine that its investigation was of such a quality as to suggest bad faith shows that she is a biased parrot of the defendants. (Doc. 301 at 15-16). As noted, Posey will not be allowed to testify in such terms at trial. Her willingness to do so

---

[13]This parallelism extends even to Mr. Posey's typographical errors.

indicates she agrees with the defendants' position, but it hardly demonstrates that her assessment — or any of her other opinions — are not her own.

### ii.  Unprofessional practices.

The plaintiff complains that Posey: kept no notes on the information she gathered; kept materials in the wrong files; purported to rely on materials not found in her files; provided in her report an incomplete list of the materials she reviewed; and could not recall reviewing certain documents listed in her report.  (Doc. 301 at 13).  The plaintiff does not argue that these lapses render her opinions unreliable but only that they preclude "independent verification of what information she had in rendering her opinions in this case."  (*Id*.).  Whatever impact Posey's organizational failures may have on the jury's assessment of her opinions, they plainly do not undermine the reliability of those opinions for purposes of *Daubert*.

The plaintiff also faults Posey for: spending only two hours inspecting the premises; relying on Cochran's representation that the extension cord she examined came from the place of the fire's origin; and relying on photographs in determining the positioning of the cord relative to the metal filing cabinet.  (Doc. 301 at 13, 24).  The plaintiff does not offer to explain why a two-hour inspection would be inadequate, why an expert should be required to independently verify the chain of custody of a piece of evidence, or why an expert cannot rely on photographs in reconstructing a scene.  These matters do not draw the reliability of Posey's opinions into question for purposes of *Daubert*.

### iii.  Dismissal of conflicting evidence.

The plaintiff asserts that Posey's testimony is contrary to evidence provided by various witnesses, including fire marshals, eyewitnesses, Deese, Owen Posey and Cochran.  (Doc. 301 at 18). Rather than expend any significant effort to support this proposition, the plaintiff invites the Court to review the entirety of Posey's 104-page report and 400-page deposition, to compare those documents with the 300-plus pages of materials the plaintiff submitted in support of its motion to reconsider, (Doc. 236), and to identify for itself inconsistencies between Posey's views and the statements of other

witnesses.  (Doc. 301 at 17-18).  The adversarial process, however, depends upon the parties to develop and support their arguments, and it is not the office of this Court to perform the parties' tasks for them.  The Court thus confines its review to those particular inconsistencies to which the plaintiff has specifically drawn its attention.[14]

The short answer to the plaintiff's argument is that an expert is not required to agree with, or defer to, other experts, and mere disagreement is not the stuff of which disqualification under *Dabuert* is made; such disagreements implicate credibility but not admissibility.  At any rate, the specific instances identified by the plaintiff are considerably less impressive than advertised.

The plaintiff emphasizes what it construes as Posey's tortured effort to minimize the impact of a police report — that Cochran "turned on the lights, and his computer began to spark, and flames began shooting out" — by questioning the qualifications of a police officer to "write down relevant things, observations from a fire."  (Doc. 301, Exhibit D at 268-69).[15]  According to the plaintiff, this exchange demonstrates that "any time information is not favorable to Eleanor Posey's theory then it is simply eliminated, ipse dixit, for no objective or substantiated reason."  (Doc. 301 at 19-20).  This is of course a sweeping generalization to draw from a single example, but even the example is not so straightforward as the plaintiff suggests.  A review of the portions of the exchange ignored by the plaintiff reflects that the substance of Posey's reaction was her skepticism that a police officer would necessarily paraphrase a witness's words without  unintentionally altering their meaning, especially when the subject (cause and origin) may be beyond the officer's expertise and especially when the witness is not given the opportunity to review the statement and confirm its accuracy.  (*Id*., Exhibit D at 269-70).[16]

_____

[14]A party is presumed to present its strongest arguments to the Court, and the inadequacy of the arguments presented by the plaintiff, as discussed in this opinion, confirms that the presumptively weaker arguments it desires the Court to formulate on its behalf could not carry the day.

[15]Posey acknowledges that the computer did not spark up and that there is no forensic evidence that would support such a theory.  (*Id*., Exhibit D at 271-72).

[16]According to fire marshal Larry Hansen, about a week after the fire Cochran told him that, when he turned on the lights, "sparks shot out from under [the computer] desk."  (Doc. 301, Exhibit G at 1).  It would seem possible that Cochran said the same to the officer, who either heard it incorrectly

The plaintiff next complains that Posey "ignored testimony of Harold Deese and Owen Posey that the cord from that area [of the computer desk and metal filing cabinet, where Posey says the fire began] was tracked and found as not being the electrical cause of the fire." (Doc. 301 at 24). Posey's report, however, expressly states that Owen Posey's testimony did not address the cord at issue. (*Id.*, Exhibit C at 20). It also accuses Deese of either missing the cord at issue or as having rendered an unsupportable opinion as to the cause of its burned insulation. (*Id.* at 44-46). Far from ignoring the testimony of the plaintiff's experts, Posey directly challenged it.

With respect to Posey's opinions concerning the quality of the plaintiff's investigation, the plaintiff bemoans her "fail[ure] to note" all the things that it did properly. (Doc. 301 at 25). The plaintiff offers no support for its remarkable, implicit position that an expert may not criticize another's performance without also praising it.

### iv.  Unsupported opinions.

The plaintiff contends that Posey's theory of how the fire started "def[ies] logic." (Doc. 301 at 10, 16, 18-19, 21). As the plaintiff describes that theory, Posey believes that "the fire was actually burning for months" before it burst into the four-foot flame Cochran says he observed. (*Id.* at 21). The plaintiff says this is illogical because there is no evidence that any employee or customer ever saw or smelled a fire. (*Id.* at 19, 21).

The deposition excerpts cited by the plaintiff, however, reflect that she testified to an ongoing short, not an ongoing fire, and that she testified she did not know how long the short had existed but affirmatively denied saying it had been months. (Doc. 301, Exhibit D at 240-41).[17] Posey further testified that the shorted cord might emit an odor, but that its position under the metal filing cabinet would make detection unlikely. (*Id.* at 241). The plaintiff has identified nothing inherently illogical or

—————————————————

or paraphrased it poorly.

[17]In her report, Posey states that it was the progressive deterioration of the cord after the short appeared that eventually gave rise to the arcing that caused the fire. (*Id.*, Exhibit C at 10-12).

impossible concerning Posey's actual testimony.[18]

The plaintiff continues that Posey's theory depends on some combustible material that the arcing could ignite and that she has filled this void in her theory only by impermissibly speculating that paper, dust and other combustible materials were present behind the computer desk. (Doc. 301 at 21). As Posey describes the physical location of the computer desk and metal filing cabinet, the equipment and materials in the vicinity, and the business's cleaning habits, (*id.*, Exhibit D at 285-87), the presence of such materials does not appear impermissibly speculative.

The plaintiff also questions the strikingly coincidental timing that Cochran entered the office late at night, just as the arcing occurred, the fire ignited, and other materials began burning sufficiently to produce a four-foot flame. (Doc. 301 at 18). The plaintiff, however, has provided no argument or authority for the proposition that *Daubert* requires an expert, not merely to provide a reliable explanation of how the fire began, but also to provide an innocent explanation for her client's behavior. Cochran's conduct may well lead a jury to decide that the fire was intentionally set, but it does not undermine for purposes of *Daubert* the reliability of Posey's opinion that an accidental electrical fire fits the physical evidence.

Next, the plaintiff objects to Posey's reliance on "generalizations unsupported by any treatise, documented facts, or other relevant authority [including] studies [or] scientific principles." (Doc. 301 at 17). Rather than identifying any of these generalizations, the plaintiff again invites the Court to peruse some 500 pages of Posey's report and deposition and draw its own conclusions. (*Id.*). For the reasons set forth earlier, the Court declines to do so.

The plaintiff also complains that Posey unfairly criticizes it for failing to discover that, within a few weeks before the fire, the office allegedly had been widely sprayed with WD-40, after flooding

---

[18]The plaintiff points out that a Florida trial court once found Posey's theory in that case to "def[y] logic." *Way v. State*, 760 So. 2d 903, 909 (Fla. 2000). However, "the views of prior judges about [an expert's qualifications] would be largely irrelevant" in a subsequent case, because "[c]ircumstances change from trial to trial, and admissibility rulings may also change from judge to judge and trial to trial." *Ferrara & DiMercurio v. St. Paul Mercury Insurance*, 240 F.3d at 8 n.4. If that is true concerning qualifications, it is certainly true with respect to reliability, as theories of cause and origin necessarily differ from case to case.

from Hurricane Georges.  (Doc. 301 at 22).  The plaintiff states (without citation to evidence) that its representative asked Cochran "whether such non-medium petroleum distillates got in the room, and how was the room used," and it posits (without explanation or authority) that this inquiry satisfied any duty it had to determine possible non-arson sources of such distillates.  (*Id*.).  The argument is too poorly supported to evaluate, but it is not intuitively obvious that the single, vague question identified by the plaintiff would meet appropriate arson investigation standards.

Next, the plaintiff challenges Posey's opinion that the medium petroleum distillate ("MPD") found in the debris samples were the result of flooding from Georges, which she opines distributed the MPD used in the shop area across the carpeted floor of the office.  (Doc. 301 at 23).  The plaintiff argues that Posey has an inadequate factual and/or scientific basis for concluding that a sufficient volume of MPD was or could have been floated from the shop area to the office and deposited there to account for Waters' sampling results.  (*Id*.).  When questioned about this at her deposition, Posey could cite only her knowledge that MPD is lighter than water (and thus would float), her "common sense" conclusion that this flotation would have redeposited the MPD in a different area of the business, and her personal observation that the building is "greasy just about everywhere you go."  (*Id*., Exhibit D at 309-14).  She conducted no tests, performed no calculations, and consulted no authorities in forming this opinion, (*id*.), which is patently unreliable under *Daubert*.  Accordingly, Posey will not be permitted to testify at trial that pre-existing MPD were redistributed into the office by flooding.

The plaintiff makes a similar argument concerning WD-40, a MPD that was sprayed in the office after the flooding.  (Doc. 301 at 23).  Posey presumably may testify reliably that WD-40 is a MPD and that it could have ignited during an electrical fire.  However, based on her deposition testimony, (*id*., Exhibit D at 309-14), she may not testify that the MPD in the tested samples came from the WD-40.

The plaintiff complains that Posey's use of the term "spoliation" is unexplained.  (Doc. 301 at 24, 25).  The Court will not review 500 pages of report and deposition to provide the plaintiff an explanation of what conduct Posey intends thereby to apprehend, but it does pause to clarify that only

-15-

conduct which has been identified in the report or deposition may form the basis of this allegation.[19] The same response disposes of the plaintiff's similar argument concerning the statement in Posey's report that critical evidence was "ignored, never sought out, spoliated, suppressed, or altered." (*Id*. at 25; *id*., Exhibit C at 17).

With respect to Posey's criticism of its documentation, the plaintiff responds that she was guilty of worse lapses, as discussed in Part A.3.ii. (Doc. 301 at 24-25). Posey's shortcomings may not be flattering, but they do not so undermine her opinions concerning the plaintiff's own shortcomings as to render them inadmissible.

In conclusion, the plaintiff for the third time requests the Court to independently review almost 1,000 pages of evidence and reach its own determination concerning the reliability of Posey's opinions. (Doc. 301 at 26-27). For the reasons set forth earlier, the Court will not do so.

### 4. Videotape.

The plaintiff also moves to exclude a videotape created by Posey in the 1980's "illustrating the behavior of ... energized electrical conductors in a wood burning fire." (Doc. 301, Exhibit D, Posey Deposition at 35). The plaintiff argues that the video is irrelevant, consists of hearsay, would unduly prejudice it, and does not satisfy *Daubert*. (Doc. 301 at 27-28). Although questioned at length in her deposition, Posey was unable to explain the relevance of the experiment to the facts of this case. (*Id*., Exhibit D, Posey Deposition at 41-50).[20] Nor do the defendants respond to the plaintiff's motion in any manner. Accordingly, the videotape will be excluded from trial.

-------------------------------------------------

[19]Posey appears to use the term "spoliation" synonymously with "alteration," which includes at least the alleged conduct of Deese and Owen Posey in removing and caring for electrical evidence. As noted in Part A.1, Posey is precluded from using the term "spoliation" at trial.

[20]Posey testified that a few of the videotaped tests involve conductors "like th[e] extension cord" that she believes was the source of the instant fire. (*Id*. at 42). However, the videotape does not attempt to explain how such a cord could cause a fire, but only how it might behave when consumed by a pre-existing fire.

### 5.  Conclusion.

For the reasons set forth above, the plaintiff's motion in limine concerning Eleanor Posey is **granted** to the extent that she: (1) may not offer expert opinions concerning Cochran's state of mind or behavior; (2) may not offer expert opinions concerning proper insurance practices; (3) may not offer expert opinions that the fire investigation of the plaintiff or any individual is indicative of bad faith or spoliation; (4) may not offer expert opinions concerning the testing of debris samples by Waters or any other witness; (5) may not offer expert opinions that pre-existing MPD were redistributed into the office by flooding; (6) may not offer expert opinions that the MPD in the tested samples came from WD-40; and (7) may not offer the videotape discussed above.  In all other respects, the plaintiff's motion concerning Posey is **denied**.

## B.  James Posey.

The plaintiff acknowledges that Posey has been identified as an expert concerning cause and origin as well as bad faith.  This includes the adjustment and investigation of the claim, including spoliation.  (Doc. 301 at 28).[21]

### 1.  Qualifications.

The plaintiff identifies no objection to Posey's qualifications.

### 2.  Relevance.

The plaintiff alleges generally that Posey's opinions concerning the quality of its adjustment and investigation of the claim lack relevance, apparently on the ground that Posey could not articulate a causal relation between the alleged improprieties and either his investigation or the existence of a debatable reason to deny the claim.  (Doc. 301 at 28-29, 31-32).  The relevance, of course, is to show that the denial of benefits was made in bad faith, including the failure to determine whether a debatable

---

[21]Posey is not listed as a witness in the pretrial order, either as a lay witness, an expert witness, or a witness whose testimony will be presented by deposition.  (Doc. 297 at 26-27, 37-43).

reason for denial existed.  *See generally Acceptance Insurance Co. v. Brown*, 832 So. 2d 1, 16 (Ala. 2001)(claim for abnormal bad faith may be based on the insurer's "fail[ure] to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review").

However, the plaintiff also argues that Posey's opinion concerning the alleged bad faith and spoliation by the plaintiff and its representatives "does not meaningfully assist the jury."  (Doc. 301 at 30-31).  As with his wife, once Posey sets forth the components of a proper adjustment or fire investigation and the plaintiff's deviations therefrom, the jury is as capable as he of drawing an inference of bad faith or spoliation.

The plaintiff attempts to stretch this argument too far, however, when it argues that the same reasoning — unhelpfulness to the jury — applies to Posey's testimony "about the duties of a claims handler."  (Doc. 301 at 30).  It is true, as the plaintiff notes, that the Court will instruct the jury concerning the duty of an insurer, but only in broad, legal terms.  The plaintiff has not attempted to show that juries innately know what the specific duties of a claims handler are, and without such information they will be ill-equipped to determine whether the plaintiff's adjustment of this claim meaningfully deviated from the norm.

The plaintiff does identify several items that are plainly irrelevant: that the policy does not list Douglas Perryman as the loss payee; that Cochran's signature on the application was not witnessed; and that the agent did not sign the application.  (Doc. 301 at 28; *id*., Exhibit I at 31-32).  Testimony on these matters will be excluded.

### 3.  Reliability.

With respect to cause and origin, the plaintiff argues generally that Posey "was hired after the fact, his conclusions dispute on-the-scene fire investigators, [his testimony] contains generalizations and vague assertions without any analysis or specific basis to challenge."  (Doc. 301 at 32).  This sweeping, unsupported pronouncement is itself too generalized and vague to support relief.

The plaintiff offers no challenge to any specific opinion concerning cause and origin.  Its one effort to do misconceives the testimony on which it is based.  When Posey testified that the plastic floor

-18-

mat in the office was a possible source of the MPD found in a sample taken from underneath it, he was not testifying that it was in fact a source but that the plaintiff's investigation was flawed in not considering the possibility. (Doc. 301, Posey Deposition, Exhibit I at 71-72). Thus, the plaintiff's argument that Posey "can provide no basis that meets *Daubert* for th[e] assertion" that the mat might contain MPD misses the mark. (Doc. 301 at 29).

With respect to bad faith investigation, the plaintiff first objects that one of its witnesses disputes Posey's opinion that removal of electrical evidence was improper. (Doc. 301 at 28). A duel of witnesses, of course, does not require exclusion of one or the other, as it is the jury's function to determine the weight of each.

Next, the plaintiff faults Posey for not taking comparison samples even though he criticizes the plaintiff's representatives for doing likewise. (Doc. 301 at 29, 31). Because the plaintiff provides only an incorrect record citation for this proposition, it cannot be evaluated. At any rate, the plaintiff has not challenged Posey's qualifications to offer opinions as to a proper fire investigation, and any unexcused[22] failure on his part to follow his own opinion in this respect does not so rob his opinion of reliability as to render it inadmissible.

The plaintiff characterizes Posey's opinion that it should have considered the possibility of an intruder as "bizarre because it completely ignores how Mr. Cochran testified that the fire started." (Doc. 301 at 29, 31). The plaintiff, who relies on an incorrect record citation, fails to explain how the possibility of an intruder was eliminated by Cochran's testimony, and the Court cannot identify any such impossibility on its own.

With respect to bad faith adjustment, the plaintiff complains that Posey has no support for his belief that hiring the Richardson law firm reflects an intent to deny the claim. (Doc. 301 at 28). In deposition, Posey admitted that his only basis for this belief was his ignorance of any other reason for the hiring. (*Id*., Exhibit I at 34-35). Ignorance does not constitute one an expert, nor does it lend one's opinions an air of authority. *See Michigan Millers Mutual Insurance Corp. v. Benfield*, 140 F.3d

---

[22]The defendants hint that, by the time Posey arrived, it was too late to take such samples. (Doc. 310 at 33).

915, 921 (11th Cir. 1998)(cause and origin expert properly excluded when his opinion of arson was based largely on his inability to identify the source of ignition).    Posey may not offer his speculation on the Richardson hiring at trial.

### 4. Conclusion.

For the reasons set forth above, the plaintiff's motion in limine concerning James Posey is **granted** to the extent that he: (1) may not offer expert opinions concerning errors in naming the loss payee and in obtaining signatures on the application; (2) may not offer expert opinions that the claims adjustment or fire investigation of the plaintiff or any individual is indicative of bad faith or spoliation; and (3) may not offer expert opinions concerning the hiring of the Richardson law firm.    In all other respects, the plaintiff's motion concerning Posey is **denied**.

## C.  Pyron Pounds and Jesse Sprayberry.

Pounds administered a polygraph test to Cochran, in which Cochran denied playing any role in, or having any advance knowledge about, the fire.    Pounds concluded that Cochran had not attempted to deceive in providing these denials.    (Doc. 310 at 35-36).    Pounds then died without giving sworn testimony.    The defendants have identified Sprayberry as an expert in polygraph analysis, to testify as to the validity of the analysis and report of Pounds.    (Doc. 297 at 41).

Until 1989, the Eleventh Circuit embraced a prophylactic rule prohibiting the introduction of polygraph evidence.    In that year, the Court concluded that such evidence could be admitted in two situations: (1) when the parties have stipulated as to its admissibility; and (2) when the evidence is used to "impeach or corroborate the testimony of a witness at trial."    *United States v. Piccinonna*, 885 F.2d 1529, 1536 (11th Cir. 1989)(en banc).    The parties have entered no stipulation concerning the use of polygraph evidence.    Moreover, because the defendants admit that the polygraph evidence is to be presented "not on the issue of Mr. Cochran's responsibility for the fire" but on the issue of the plaintiff's "state of mind" when it denied the claim, (Doc. 310 at 35), the evidence is not offered as corroboration

of Cochran's expected trial testimony.  Accordingly, it is inadmissible under *Piccinonna*.[23]

Even had the defendants not disavowed corroboration as a purpose, it does not appear that the evidence could be admitted.  First, it is not clear that the plaintiff "was given reasonable opportunity to have its own polygraph expert administer a test covering substantially the same questions." *United States v. Piccinonna*, 885 F.2d at 1536.  Second, corroboration evidence is admissible only to the extent that other rules of evidence allow, *id.*, and the defendants have identified no rule that would authorize the use of their polygraph evidence in this fashion.[24]

The plaintiff's assertion  that the evidence should be excluded under *Daubert* and Rule 403, (Doc. 301 at 33), is too generalized to be evaluated but, in light of the defendants' failure to satisfy *Piccinonna*, the failure does not alter the result of its motion.[25]

For the reasons set forth above, the plaintiff's motion in limine concerning Pyron Pounds and Jesse Sprayberry is **granted**.  The plaintiff's substantively identical motion in limine regarding polygraph examination, (Doc. 303), is likewise **granted**.  No evidence concerning polygraph testing or results will be allowed at trial.

## D.  Don Mosley.

Mosley has been identified as an expert concerning the analysis of audio recordings.  (Doc. 297 at 41).  He is being offered to testify to alterations allegedly made to an audio cassette recording of Deese's interviews of Cochran and witness Pete Preston.

Mosley first listened to the tape using very good speakers and during both interviews heard "holes," (events where the ambient background noise disappeared), including one of approximately 27

---

[23]The defendants rely on authority from the Sixth Circuit, but its broader views on the admissibility of polygraph evidence cannot trump controlling precedent from the Eleventh.

[24]The *Piccinonna* Court identified Rule 608 as a possible source of such authority, *id.* at 1536, but it has been noted that polygraph evidence does not easily conform to the strictures of that rule. *E.g., Maddox v. Cash Loans II*, 21 F. Supp. 2d 1336, 1338-40 (N.D. Ala. 1998).

[25]*See generally United States v. Henderson*, 409 F.3d 1293, 1303 & n.7 (11th Cir. 2005) (satisfaction of *Piccinonna* does not obviate satisfaction of *Daubert*).

seconds in the Preston interview.  (Mosley Deposition at 47, 54, 57 & Exhibit 6).  He testified that such holes can result from a tape defect (which he considered highly unlikely given modern tape technology), from erasing the taped material, or from recording over the taped material.  (*Id*. at 49, 51, 54 & Exhibit 6).  He later used computer software to detect a "record signature" at the beginning of the 27-second hole and to compare that signature to the record signature at the beginning of the Preston interview, which he found to be the same, leading him to conclude that the same machine that recorded the Preston interview also recorded over the 27-second segment.  (*Id*. at 52-55, 58, 80 & Exhibit 6).

### 1.  Qualifications.

Although compressed by the parties, Mosley's qualifications must be gauged at three separate points: (1) his qualifications to detect holes aurally; (2) his qualifications to identify the probable cause of such holes; and (3) his qualifications to run the computer software and interpret the results.

Mosley testified that it is "pretty obvious" when a hole occurs, (Mosley Deposition at 54), and the plaintiff does not challenge this statement.  Neither is it facially dubious, since the absence of background noise would appear to be readily detectable by most patient listeners, especially when the hole is prolonged.  The Court concludes that Mosley is qualified to render an expert opinion as to the presence of holes on the tape.

Mosley testified that he has operated a recording studio and production company for 30 years, (Mosley Deposition at 12, 14), work that would presumably provide him with substantial experience with holes and their causes.  The Court concludes that Mosley is qualified to render an expert opinion as to the probable causes of the holes he detected on the tape.

Mosley has not identified any qualifications to run the computer software or to interpret its results.  Because interpretation is just as important to his opinions as to a radiologist's,[26] the lack of any

---

[26]The graphs which purportedly reflect the computer analysis of the two record signatures, (Mosley Deposition, Exhibit 6), do not obviously support Mosley's conclusion that they are "identical." (*Id*. at 55).  Thus, his interpretation is essential to allow the inference that the signatures came from the same machine.

-22-

such qualifications precludes him from testifying as to his computer analysis.[27]

### 2. Relevance.

The plaintiff suggests without explanation that any alteration of the Preston interview is irrelevant. (Doc. 301 at 37). Alteration of the Preston interview would appear to be relevant for the same reason as alteration of the Cochran interview — to support the defendants' theory that the plaintiff manipulated the evidence to support its conclusion of arson.

### 3. Reliability.

The bulk of the plaintiff's arguments are focused on reliability, with most of them implicating Mosley's computer analysis of the Preston interview. While the Court shares some of the plaintiff's concerns about the reliability of Mosley's opinions regarding the computer analysis, it is unnecessary to reach those issues since Mosley is unqualified to render these opinions to begin with.

The plaintiff's objections concerning Mosley's other opinions are unavailing.[28] The plaintiff first complains that Mosley in deposition was unable to explain the holes he had described in an affidavit. (Doc. 301 at 35-36). His affidavit, however, explains what holes are and how they are made, (*id.*, Exhibit 6), and the plaintiff has not suggested what necessary detail Mosley was unable to offer. The plaintiff obliquely criticizes Mosley's reliance on his aural review of the tape to identify holes, (Doc. 301 at 38), but it has not suggested why Mosley's presumably trained ear cannot be trusted to hear holes in the recording.

---

[27]Because Mosley is not qualified to interpret the computer results, it would be unduly prejudicial to allow him to testify that he performed a computer analysis — unless, of course, the plaintiff opens the door, as by suggesting that Mosley's work was superficial. (*See, e.g.*, Doc. 301 at 38 (challenging Mosley's reliability because he was "on a tight budget")).

[28]This includes the plaintiff's objection to the thoroughness of the defendants' Rule 26(a)(2) disclosures, (Doc. 301 at 37), which were submitted some eight months before the instant motion was filed.

### 4. Conclusion.

For the reasons set forth above, the plaintiff's motion in limine concerning Don Mosley is **granted** to the extent that he may not offer expert opinions concerning any computer analysis of the tape.  In all other respects, the plaintiff's motion concerning Mosley is **denied**.

## E.  Daniel Koch.

The defendants have identified Dr. Koch as a psychologist and "behavioral-trauma" expert.  (Doc. 297 at 41).  He is expected to testify as to the absence of any motive for Cochran to commit arson and on the connection between fire and critical thinking.  (Doc. 301 at 39-40; Doc. 310 at 40).[29]  Dr. Koch's opinions are based on his interview of Cochran and administration of the MMPI-II and other tests.

### 1. Qualifications.

The plaintiff identifies no challenge to Dr. Koch's qualifications to render the opinions at issue.

### 2. Relevance.

The plaintiff argues that Dr. Koch's opinions are irrelevant because Cochran's "state of mind" is not at issue.  (Doc. 301 at 41).  This is a peculiar argument to come from a party that has long insisted that Cochran had a financial motive to commit arson and that his behavior on the night of the fire is inconsistent with innocence.

### 3. Reliability.

The plaintiff does not contest the reliability of Dr. Koch's opinion that Cochran does not suffer from mental illness.  Its arguments are limited to the behavioral and motive aspects of Dr. Koch's opinions.

---

[29]According to the defendants, Dr. Koch will also testify that he finds nothing remarkable about Cochran's behavior after discovering the fire.  (Doc. 310 at 40).

-24-

With respect to motive, the plaintiff complains that Dr. Koch's opinion is wholly dependent on Cochran's representation that he and his business were financially successful. (Doc. 301 at 42). The difficulty as the Court sees it is not so much the reliability of the information on which Dr. Koch relied, or the reliability of his conclusion assuming the accuracy of the information he received. Rather, the difficulty is that the jury is in as good a position as Dr. Koch to determine the accuracy of Cochran's statements about his financial health and, assuming it credits his statements, to draw the conclusion that a financially successful businessman lacks the motive to commit arson.

With respect to behavior, Dr. Koch has opined that "[t]rauma typically creates the suspension of critical thinking" and that "[i]t is certainly traumatic to find oneself in a fire." (Doc. 301, Exhibit U at 3). The plaintiff complains that Dr. Koch offers nothing but his ipse dixit for these statements, (Doc. 301 at 42), and the Court agrees. The defendants have pointed to nothing that could support the conclusion that Dr. Koch's opinion represents scientific knowledge. Indeed, by ignoring the plaintiff's challenge, (Doc. 310 at 39-40), they effectively concede the point.

### 4. Conclusion.

For the reasons set forth above, the plaintiff's motion in limine concerning Daniel Koch is **granted** to the extent that he: (1) may not offer expert opinions concerning Cochran's motive to commit arson; (2) may not offer expert opinions concerning trauma and its effect on critical thinking; and (3) may not offer expert opinions concerning Cochran's behavior after discovering the fire. In all other respects, the plaintiff's motion concerning Dr. Koch is **denied**.

### F. Lewis Pannell.

Dr. Pannell is acknowledged as an expert in gas chromatography ("GC") and mass spectrometry ("MS"). (Doc. 301 at 46). He is expected to offer opinions concerning chemicals present at the scene based on the GC/MS analyses performed by the plaintiff's experts. He is also expected to offer criticisms of their methodology. (Doc. 310, Exhibit I).

-25-

### 1. Qualifications.

The plaintiff argues that, although Dr. Pannell is an expert in GC/MS, his experience using those techniques does not include fire debris analysis. (Doc. 301 at 43-48). Dr. Pannell, however, testified that the principles governing GC/MS are the same regardless of the underlying purpose of the analysis, (Doc. 301, Exhibit V at 15), and the plaintiff has not challenged that proposition.

### 2. Relevance.

The plaintiff argues that, due to his inexperience with fire debris analysis, Dr. Pannell's report references background spectra that have no significance to fire debris analysis. As the plaintiff recognizes, this is not truly a challenge to the relevance of Dr. Pannell's opinions under Rule 401 and *Daubert*, but the expression of a concern about juror confusion if Dr. Pannell bombards them with extraneous detail in the course of delivering his relevant opinions. (Doc. 301 at 47-48). That is a matter for another day, but the defendants may want to consider paring down Dr. Pannell's presentation prior to trial.

The plaintiff also complains that Dr. Pannell criticizes the failure of one of its experts, Laurel Waters, to look at mass spectra even though that is not required by (unidentified) regulations. (Doc. 301 at 48-49). The issue, however, is whether Waters performed an appropriate evaluation, not a minimally permissible one, and Dr. Pannell testified that there were circumstances that should have caused Waters to review the mass spectra in this case. (Doc. 301, Exhibit V at 72).

Finally, the plaintiff argues that Dr. Pannell created a tempest in a teapot by criticizing Waters for identifying a MPD in a sample but failing to determine whether other distillates were present. (Doc. 301 at 49). Without a context, which the plaintiff does not provide, the Court cannot determine whether this criticism is relevant.

### 3. Reliability.

The plaintiff identifies no challenge to the reliability of Dr. Pannell's opinions. However, the

Court's ruling on the defendants' motion in limine requires a corresponding ruling with respect to Dr. Pannell. The Court has ruled that Waters may not offer expert opinion concerning the "high concentration" of MPD in the samples she tested or her derivative opinion concerning the likelihood that the MPD in the samples was deposited in the office through tracking from foot traffic. Because Dr. Pannell admits he had no more information concerning the concentration of MPD than did Waters, (Doc. 307, Exhbit A-2 at 141-42), he likewise may not testify as to that concentration or the likelihood that the MPD came from tracking. Similarly, because Waters may not offer these opinions, Dr. Pannell may not criticize her for attempting to offer them.

### 4. Conclusion.

For the reasons set forth above, the plaintiff's motion in limine with respect to Lewis Pannell is **granted** to the extent that he: (1) may not offer expert opinions concerning the concentration of MPD in the samples tested by Waters; (2) may not offer expert opinions concerning the likelihood that the MPD found in the samples are the resulting of tracking from other areas of the business; and (3) may not offer expert opinions concerning the quality of Waters' analysis and/or opinions in these areas. In all other respects, the plaintiff's motion with respect to Dr. Pannell is **denied**.

DONE and ORDERED this 2nd day of September, 2005.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE